REVISED, JANUARY 30, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 97-40429

JANE DOE, JUNE DOE, JANET DOE,
AND JILL DOE, By their next friends,
SUSAN DOE, MARY DOE AND LISA DOE,

                                        Plaintiffs-Appellants,

                        versus

BEAUMONT INDEPENDENT SCHOOL
DISTRICT,

                                        Defendant-Appellee.

Appeal from the United States District Court
For the Eastern District of Texas

January 26, 2001

Before KING, Chief Judge, and POLITZ, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we consider a challenge to the Beaumont Independent School District's "Clergy in the Schools" program, which enlists various clerical volunteers to counsel groups of students regarding secular topics. We granted en banc review after a panel of this court, reversing the district court, held that the student plaintiffs had standing and that the program violated the

Establishment Clause of the First Amendment.  We agree that the plaintiffs have demonstrated standing sufficient to withstand summary judgment.  However, perhaps because the parties did not squarely engage each other on the merits, they have produced an uncertain record burdened with genuine issues of material fact, including the place of the clergy program in the District's larger overall volunteer program.[1]  We therefore REVERSE, and REMAND to the district court.

The ultimate question in this Establishment Clause case is equality of treatment: whether the school board preferred religion over non-religion.  It follows, at trial, that the district court must not confine its analysis to only "Clergy in the Schools." Rather, the court can and should examine the targeted program in its full context, viewing it as it actually operates in its setting, including other programs similar in purpose and function. If the set of programs together comprise a mosaic that is neutral with regards to religion, then the Establishment Clause is not offended.  The program's mission and means pose questions of fact, subsidiary to the ultimate question of whether the school district has impermissibly preferred religion over non-religion, which preclude the grant of summary judgment.  Although we reverse the grant of summary judgment and remand for trial, we discuss the

---

[1]We refer to Judge Wiener's opinion concurring in part and dissenting in part as the principal dissent because it expresses the view of the largest number of dissenting judges.

record both to locate the genuine issues of material fact and to provide guidance to the district court, reminding that standing must be demonstrated at all stages, including trial.

I

The plan presents a novel configuration of Establishment Clause issues.  In 1996, the Beaumont Independent School District instituted a volunteer program in its elementary and middle schools called "Clergy in the Schools."  The District solicited volunteers from area clergy of all local faiths, the majority of which are Protestant Christian.  Participants conducted group counseling on secular issues including race, divorce, peer pressure, discipline, and drugs.  The program's stated goals were to provide (1) meaningful dialogue between the clergy and students regarding civic values and morality; (2) a safe school atmosphere; and (3) volunteer opportunities.

Well aware that it was walking a legal high wire, the District took several steps to avoid constitutional concerns regarding the content of the counseling sessions.  It schooled the clergy regarding legal strictures, instructing them not to wear clerical garb, identify their religious affiliations, engage in religious discussions, or quote the Bible.  Requests for prayer were to be deflected to outside of the school.  The District also prohibited

3

discussions regarding sex or abortion.  School officials attended the meetings along with the clergy and students.[2]

Participation by students in the program was voluntary, although no parental consent was required.  Students who wished to participate could do so, but participation was also solicited on a random basis.  The record is unclear regarding that mix.  The record is also unclear as to the numbers of students participating: at the program's inception, it was to involve one or two visits to each school per year with about 35 students per session.

The plaintiffs presented several facts in support of their claim that the program sought to create a stronger school-church bond.  Superintendent Carrol Thomas, who initiated the program, at one time advocated a need for prayer in schools.  At the first training session for the program, the PTA president distributed a leaflet entitled, "Reasons for a Church-School Alliance."  After the filing of the Does' Complaint, the District sent a letter to the volunteers clarifying that the goals expressed in the leaflet were not part of the program.  One volunteer quoted the Bible at a counseling session.  In response, the District prepared a "Fact

---

[2]The principal dissent's recitations regarding these administrative matters are contrary to the record.  The record reflects that the school selects student participants for some of its programs (for example, the fraternity program participants are recommended by teachers) and conducts some programs in small groups (the Junior League's activities, for example, may involve whole classrooms or smaller groups, depending on the teacher's wishes).  According to the District's volunteer coordinator, every program involves oversight by school officials.

4

Sheet" for the volunteers reciting the secular nature of the program. Outside of the school, the clergy prayed together before the counseling sessions, and Superintendent Thomas asked them to preach about substance abuse in their worship services and to help prepare students for the Texas standardized examinations.

The record reflects a number of volunteer opportunities for adults, which are administered through its "School Volunteer Program." Those programs include a sorority which conducts fairs and a child safety program; several corporate volunteer programs; senior citizen volunteering, some of which includes mentoring; and DARE, an anti-drug program involving police officers. There are also volunteer programs involving mentoring funded by sources outside the Beaumont public schools. From the record it is difficult to decide as a matter of law whether these opportunities provide services to the students that are comparable to the counseling and mentoring featured in the clergy program.

Before the District initiated the program, one of the parent plaintiffs read about the program in the newspaper. She requested that the District integrate professionals from secular counseling professions into the program. After the District refused her request, she and the other Doe plaintiffs brought suit to enjoin the program from going forward. They alleged that it violated the Establishment Clause of the First Amendment as well as the Texas Constitution. The district court denied a temporary restraining order. Later, on cross-motions for summary judgment, the district

5

court granted summary judgment to the District, holding that the plaintiffs lacked standing and, alternatively, that the program did not violate the Establishment Clause. The Doe plaintiffs appealed to a panel of this court, which reversed the district court. The District then sought en banc review, which we granted.

II

Article III of the U.S. Constitution requires that a litigant have standing to invoke the power of a federal court. The focus of standing is on the parties' right to have the court decide the merits of the dispute.[3] To demonstrate standing, the plaintiff must show an "injury in fact," a requirement assuring that the court will not "pass upon . . . abstract, intellectual problems, but will adjudicate concrete, living contest[s] between adversaries."[4] The injury alleged must be actual or imminent and not abstract, conjectural, or hypothetical.[5]

By insisting that a plaintiff have a personal stake – an individuated interest rather than an interest in good government shared by all citizens – Article III avoids enlisting federal courts in policy exercises about how the government operates. This insistence vindicates principles of separation of powers and

---

[3]See Warth v. Seldin, 422 U.S. 490, 498 (1975).

[4]See Federal Election Comm'n v. Akins, 524 U.S. 11, 20 (1998) (internal quotations omitted).

[5]See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv's, Inc., 120 S. Ct. 693, 704 (2000).

federalism by closing the doors to those who would only entreat the court to superintend the legal compliance of the other branches and the states.  For example, in Valley Forge Christian College, the plaintiffs learned of the federal government's conveyance of property to a religious institution in another state.  Those plaintiffs had no relationship to the government action at issue other than an interest in seeing the law enforced.[6]  They had suffered no injury from any unconstitutional acts not suffered by all citizens.

At the same time, the fact that many persons suffer an injury does not mean that no person has suffered the requisite injury.[7] Plaintiffs have standing to assert, for example, that their use or enjoyment of a public facility is impaired by an alleged violation of the Establishment Clause.[8]

Such a claim of standing is even stronger when the plaintiffs are students and parents of students attending public schools. Students and their parents enjoy a cluster of rights vis-à-vis their schools - a relationship which removes them from the sphere

---

[6]Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485-86 (1982).

[7]See Akins, 118 S. Ct. at 1786.

[8]See Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir. 1989); Hawley v. City of Cleveland, 773 F.2d 736, 740 (6th Cir. 1985).

of "concerned bystanders."[9]  The Supreme Court has recognized that students have a judicially cognizable interest in a right to receive an education in a racially integrated school.[10]  Similarly, the Court has repeatedly stated the right of children and their parents to receive public education that is compliant with the First Amendment's Establishment Clause.[11]  This is not to suggest that children and their parents need not have an individuated injury.  Rather, the point is that they have often been found to have suffered an injury, albeit along with many other students and parents.

In this case, the question of standing was initially framed by the District's contention that the option not to participate in the program deprives the Does of a cognizable injury.  In response, the panel opinion concluded that the threat of exposure to random summons to the program was a sufficient injury.  We need not return to that joust:  standing may be supported by more direct reasons.  Of course, the parties cannot confine our inquiry into standing to the initial field of engagement.  We must satisfy ourselves of our

---

[9]See Bell v. Little Axe Indep. Sch. Dist. No. 70, 766 F.2d 1391, 1398 (10th Cir. 1985) (holding that parents have standing to allege that the state acts unconstitutionally to establish a religious preference).

[10]See Allen v. Wright, 468 U.S. 737, 756 (1984).

[11]See School Dist. of Abington Township v. Schempp, 374 U.S. 203, 224 n.9 (1963); People ex rel. McCollum v. Board of Educ., 333 U.S. 203, 206 (1948).

own and the district court's jurisdiction, even if the parties are prepared to concede standing.[12]

The District's characterization of standing fails to grasp the full harm of which the plaintiffs complain. The Does have asked that this effort to enrich the curriculum be modified so that they may participate. There is little doubt that limiting access to the full curriculum offered by the school would injure these students.[13]

In sum, there is standing beyond the Does' status as students or parents of students at the school.[14] Opportunities for counseling and mentoring services are a needed and valued component of public education. The District supported this mentoring program

---

[12]See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).

[13]We are persuaded that pleading and proof of the Does' standing were offered. The District initially moved to dismiss for lacking of standing as a Rule 12(b)(6) motion. That motion was still pending when the District moved for summary judgment. The district court by separate order decided that the filing of the motion for summary judgment mooted the Rule 12 motion. The question of standing was then joined in the summary judgment motion. The Does replied to the motion for summary judgment by attaching submissions made at an earlier hearing on application for a temporary restraining order, including a transcript of the oral testimony of one parent and three affidavits of others. As we read the affidavits, the parents sought the benefits of a quality program and believed there were no other programs offering comparable mentoring opportunities. We need not impose that contention on them; at trial, the individuals can state their own testimony and, in proving their standing, quell disagreement over the reading of the summary judgment record.

[14]Cf. Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 408 (5th Cir. 1995) (student had no standing to protest the Gideons' leaving Bibles on a table in a foyer in a building housing lower grades than the plaintiff's grade, a building which she never would have entered).

with its money and resources.  At bottom, the claim is that the program unconstitutionally prefers religion over non-religion, that the students cannot participate in the school's offered program without taking part in an unconstitutional practice.  If found at trial, this works a deprivation of a student's right not to be excluded from the benefits of a school-financed educational offering – a concrete, judicially cognizable injury.

### III

In evaluating the merits of the Doe plaintiffs' Establishment Clause claim,[15] we consider their allegations in light of three lines of analysis developed by the Supreme Court.  First, the three-part inquiry of <u>Lemon v. Kurtzman</u> asks (1) whether the purpose of the practice is not secular; (2) whether the program's primary effect advances or inhibits religion; and (3) whether the program fosters an excessive government entanglement with religion.[16]  The second test, the "coercion" test, measures whether the government has directed a formal religious exercise in such a way as to oblige the participation of objectors.[17]  The final test, the "endorsement" test, prohibits the government from conveying or attempting to convey a message that religion is preferred over non-

---

[15]As the district court made no determination as to plaintiffs' claims that the Program violated the Texas Constitution, we do not do so here.

[16]403 U.S. 602, 612–13 (1971).

[17]<u>See</u> <u>Lee v. Weisman</u>, 505 U.S. 577, 586 (1992).

10

religion.[18]  We will apply the latter two tests to the program's effects, rather than its purpose or structure, thus focusing on the plaintiffs' strongest contention that the program is non-neutral.

A

Under Lemon, we first analyze whether the Clergy in the Schools program had a secular purpose.[19]  Courts normally defer to a government's statement of secular purpose.  That purpose, however, must be sincere and not a sham.[20]

The District's stated purposes of the program – to provide dialogue between the clergy and students regarding civic values and morality, a safe school atmosphere, and volunteer opportunities – are secular goals.  It is permissible for a school to promote discussions on morality, safety, and volunteering from the community.  That these goals may overlap with some religious views is of no moment.[21]

The Does suggest that the stated purposes are a sham, pointing to Superintendent Thomas's statement that prayer is needed in schools; the church-school alliance leaflet distributed to the volunteers; the District's encouragement of volunteers to provide counseling and tutoring in their churches; the prayers conducted by

---

[18]See County of Allegheny v. ACLU, 492 U.S. 573, 592-93 (1989).

[19]See Edwards v. Aguillard, 482 U.S. 578, 585 (1987); Lemon, 403 U.S. at 612.

[20]Edwards, 482 U.S. at 586-87.

[21]See Bowen v. Kendrick, 487 U.S. 589, 612-13 (1988).

11

the volunteers at their pre-counseling meetings; and the Bible quotation used by one of the volunteers at a student session.

We are not persuaded that these indicia are sufficient to demonstrate as a matter of law that the purpose of the Program was not secular. Superintendent Thomas's requests regarding tutoring and prayer at church, as well as the volunteers' prayers before meetings, were not part of the program and the summary judgment record indicates no hidden purpose in conducting it. The record does demonstrate that following the two violations of the program's stated goal – the PTA president's distribution of the information sheet and the Bible quotation used by one of the volunteers - the District sent out literature to the volunteers clarifying the secular purposes of the program.

In reaching its conclusion that the program exhibited an impermissible purpose, the principal dissent relies on several statements it claims were made in disseminated "pamphlets," "informational materials," and "publicity." Again, the principal dissent's enthusiasm runs ahead of the record. The quoted language regarding "doing the right thing" and the benefits of volunteering for the clergy in their vocations comes from a document entitled "Meeting with Ministers," an agenda sheet for the program's orientation. There is no evidence in the record that this sheet was even distributed. The statements contained in the agenda sheet were listed not under the "Goals" heading of the agenda, but under "Expect[at]ions." More importantly, they were cited not as

purposes, but as indications of what the clergy could expect from participation.[22]    The principal dissent's finding of an impermissible purpose cannot be made as a matter of law, if at all. There is no impermissible purpose in pointing out to potential volunteers the benefits they can expect or in relating how valuable their participation will be.  Few would deny the difficulty of recruiting volunteers for schools.

The principal dissent is left with citing the exclusivity of the clergy program as expressing an impermissible purpose. Unsatisfied with testimony that the District's volunteer programs are routinely grouped around a vocational, corporate, or social affiliation, and that the clergy were tapped because of their collective experience with listening to problems and talking to groups, the principal dissent pieces together a quotation from Joy James, the District's volunteer coordinator, and interprets it to mean that the District believes clergy have unique substantive experience in the field of morals.  James, however, specifically denied that the purpose of separation was to convey any special message "that only clergy can convey."  Moreover, the District's encouragement of people from all walks of life to participate in various other mentoring programs rebuts the dissent's conjecture. We cannot find here as a matter of law that the stated purposes of

_____

[22]The other listed "expect[at]ions" were morning meetings, visits to different schools in different months, and a timetable for participation.

the program were not permissible or pretextual. Thus, we cannot find as a matter of law that the program ran afoul of the purpose prong of Lemon. We leave this issue for trial. The parties may adduce such evidence as they can bearing on the question of whether the stated purposes were pretext.

B

The second prong of Lemon examines whether the program at issue has the primary effect of advancing or inhibiting religion.[23] The Court has identified several types of impermissible effects. Two are relevant here. First, we ask whether the program will cause state-sponsored inculcation of religious beliefs.[24] In the context of this program, this inquiry dovetails with the coercion test of Lee v. Weisman, asking whether the District has directed a religious activity in such a way as to compel participation.[25] These impermissible effects turn on whether the Program encourages religious indoctrination or involves religious services.

The Supreme Court has assumed that a religious organization may be unable to follow the secular guidelines of a program only if the organization is "pervasively sectarian."[26] An interfaith group of clergy in the program's setting is not "pervasively sectarian."

---

[23]See Lemon, 403 U.S. at 612.

[24]See Agostini v. Felton, 521 U.S. 203, 223 (1997).

[25]See Lee, 505 U.S. at 586.

[26]See Bowen, 487 U.S. at 612.

The volunteers are working in a secular setting with other volunteers who subscribe to different faiths.  Thus, we presume that the volunteers will comply with the program's secular guidelines.  The plaintiffs' only evidence to the contrary, the Bible quotation by one volunteer, is not sufficient to demonstrate state-sponsored inculcation.

Similarly, because the counseling does not constitute a religious exercise, the Program does not violate the coercion test. We cannot imply from the presence of a minister that the message cannot be secular – a commonsense observation that is also the law. If no religious activity is at issue, any speculation as to whether students might feel pressured to participate is irrelevant.  We conclude that the summary judgment record does not support a conclusion that the program violates the coercion test.

We turn to the second group of impermissible effects: the core question of non-neutrality.  The Court has required that a government allocate benefits among secular and religious organizations in a neutral manner.[27]  A non-neutral program is impermissible because it could convey the message that the religion-oriented recipients are uniquely qualified to carry out

---

[27]See Mitchell v. Helms, 120 S.Ct. 2530, 2541 (2000) (plurality) ("[W]e have consistently turned to the principle of neutrality."); Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 842 (1995) (discussing religion-neutral criteria); Bowen, 487 U.S. at 605.

those services.[28]  Put another way, it is impermissible for the government to "endorse" religion by conveying a message that religion is preferred over non-religion.[29]

Apart from the principal dissent's disagreement with the majority's reading of the record,[30] the central disagreement among the three opinions today is how we should measure the constitutional significance of a program whose potential non-neutrality or endorsement stems only from its symbolic affiliation. This is not a case involving devotional activities, proselytization, or benefits to religion.  We are presented with a symbolism case, but a unique version of one: one whose symbolism draws not from a visual symbol, as in Allegheny v. ACLU, but from a government-sponsored activity.

This difference presents some analytical difficulty, which both dissents – while reaching opposed results – summarily dismiss. Judge Jones would exclude the symbolic import of a group of clergy

---

[28]See Bowen, 487 U.S. at 604-05 (permitting aid distributed neutrally among secular and religious organizations and not suggesting superiority of religious groups).

[29]See Allegheny, 492 U.S. at 593.

[30]Standing alone, that disagreement would warrant a remand – not, as the dissent urges, summary judgment in favor of the Does. The dissent argues that all reasonable inferences should be construed in favor of the Does, but that rule extends only to reviewing the summary judgment in favor of the District, not to reversing and granting summary judgment to the Does.

16

from the Establishment Clause analysis altogether.[31]  The principal dissent seizes upon the notion that "each decisional element" must be scrutinized for constitutional failing but never bothers to analyze what constitutes such a decisional element.

A government-sponsored activity such as a volunteer program may indicate non-neutrality or endorsement.  The key question is in what context we assess that activity – by a narrow examination of each individual extracurricular program, or from the perspective of the District's entire menu of volunteer mentoring and counseling programs.  The Supreme Court has allowed clerical figures to perform secular duties as long as the government neutrally allowed those duties to be performed by secular or religious figures.[32]  The District argues that it allows and sponsors mentoring opportunities for both religious and secular figures.

The principal dissent would have us look only at the clergy program in answering the question of neutrality.  We are assessing a school's volunteer program, however, not analyzing a statutory scheme.  While a statute addressing a particular matter is presumably the legislature's comprehensive treatment of that topic, the District's volunteer programs seem to be more piecemeal and

---

[31]We are unsure of what rule Judge Jones' dissent would advance.  At parts, it seems to contend that the program was permissible regardless of the context in which it was offered.  At others, it appears to accept that the program's legality hinges on the presence of other volunteer programs.

[32]See Bowen, 487 U.S. at 613; Roemer v. Board of Public Works, 426 U.S. 736, 745-46 (1976).

17

organized around groups of volunteers. For example, the DARE program is organized around the participation of local police officers, not as the District's last word on the prevention of substance abuse. Thus, the District's grouping of clergy does not appear to be a limit upon mentoring or counseling volunteer opportunities of other groups. Looking at the District's policies in light of its entire volunteer program, we cannot say as a matter of law that the program is not neutral with respect to religion.

This record, developed as it was on limited summary proceedings, lacks sufficient detail regarding the overall set of volunteer programs operated by the District to sustain a summary judgment in either direction. We therefore leave this issue for trial and instruct the district court to consider the entire set of volunteer programs operated by the District – including, but not limited to the "Clergy in the Schools" program – in answering the question of whether the District preferred religion over nonreligion.

The endorsement analysis under Allegheny, which begins with the element that carries religious symbolism, also requires us to examine the volunteer program as a whole. In a visual display, every element carries with it complete symbolic content. The elements are prototypical symbols, conveying a whole message within a single visual marker. In our case, an individual clergy member, wearing no vestments and untitled, is not a symbol. Instead, the most basic symbolic element in our case is the clergy's presence as

18

a counseling group. We agree with the Does that the presence of a group of clergy participating in a program called "Clergy in the Schools" carries some symbolic weight. Even if the clergy do not wear their clerical vestments, the program suggests that they have been chosen as a group because of a perceived expertise in the fields of civic values and morals.

Again, we look at that symbol not in a vacuum, however, but within its relevant context. In Allegheny, the Court did not focus on a government's decision to display a Chanukah menorah in isolation, but considered it within the context of the government's inclusion of other elements including a Christmas tree and a sign saluting liberty.[33] The Court determined that the particular setting "negated" any message of endorsement of religion.[34]

C

The Lemon test's third prong bars excessive entanglement.[35] Administrative cooperation alone does not constitute such a violation. Only programs that require "pervasive monitoring" run afoul of the Establishment Clause.[36] The Court has held that to

_____

[33]Allegheny, 492 U.S. at 598-600, 614-18.

[34]Id. at 595. As Justice O'Connor points out in her concurrence in Allegheny, the setting does not neutralize the object's religious significance; rather, it "changes what viewers may fairly understand to be the purpose of the display." Id. at 635 (O'Connor, J., concurring) (citations omitted).

[35]See Lemon, 403 U.S. at 612-13.

[36]See Agostini, 521 U.S. at 232-34.

require from religious officials the performance of administrative duties consistent with and not more onerous than those required from non-religious officials in analogous programs does not constitute excessive entanglement.[37]

In Agostini v. Felton, the Court found no excessive entanglement where a school district sending public school teachers to parochial schools under Title I provided training regarding the secular nature of the program, required the removal of religious symbols from private school classrooms, and made unannounced visits to classrooms about once a month.[38] The program here is very similar to the controls in Agostini in terms of training and visual symbols. The monitoring requirement could be characterized as "pervasive" because an administrator attends every session, rather than attending sporadically. Because the District monitors all of its volunteer programs, however, that supervision imposes no unique administrative burdens. That the District sent a mailing soliciting the clergy volunteers appears to have been a function of having no existing umbrella organization rather than an administrative need occasioned by the volunteers' religious professions. In the absence of a need for the District to undertake measures it does not follow with respect to other programs, we find no excessive entanglement.

---

[37]See Roemer, 426 U.S. at 764.

[38]Agostini, 117 S. Ct.

20

IV

Establishment Clause analysis requires that we be sensitive to the context and circumstances attending each case.[39]  If the clergy program is fairly viewed, on a fully developed record, as part of a larger framework of secular mentoring and counseling programs, it has not run afoul of the Establishment Clause.  Here, the very simplicity of mixing the clergy with others occasions the need for a fact finder's settlement of the reasons for the District's rejection of that solution.  The record evidence leaves us with a blurred picture of the District's volunteer program as a whole.  It is unclear whether the mentoring in other programs is narrow in scope, or whether it reaches to a meaningful degree the broader counseling emphasized in the clergy program.  This question is not properly answered by merely considering the names of other programs or the groups invited to participate.  When an athlete comes, for example, to speak to students about athletic achievement, that discussion can be thin or thick.  It can be a simple discussion of winning techniques for a specific sport, or it can emphasize larger themes of teamwork, self-discipline, goal setting, truth telling, giving, relationships, and hard work; values the "clergy" must also teach.  Their very kindred nature would belie a preference for religion over nonreligion – unless the district effectively took the tack that only preachers can teach this subject.

---

[39]See Allegheny, 492 U.S. at 636-37 (O'Connor, J., concurring).

21

We cannot conclude as a matter of law that there is an absence of genuine issues of material fact so as to sustain a grant of summary judgment for either party on the question of whether the District is preferring religion over non-religion. The district court may find that only the clergy are invited to imbue these values, that other programs differ in both mission and means, or it may find that other professions similarly engage the students, through the unique lens of their respective professions by active mentoring through the powerful presence of lives well lived. That the perspectives of the different programs differ is not a touchstone of invalidity. To the contrary, the District urges that it seeks the differing perspectives upon common values and civic virtues – a quest that will produce different looks for the components of a larger program. A trial must sort out these assertions of fact.

V

Facts decide cases at every level and of all types. That a case or controversy has no disputed questions of fact does not undercut this statement. Nor is there some exception for cases of public interest or for cases perceived by some measure to be more important than others. No member of this Court would openly decide questions of law that were not before the Court as part of a case or controversy. This does not mean that it does not happen; without a sound resolution of fact, this "case or controversy" remains undefined, leaving its opinions to read like essays or

22

editorials about schools and religion. The dry legal observation that an opinion fails to accept genuine issues of material fact conceals its profound consequences. Facts and their resolution lie too close to the heart of the judicial function to treat them as little more than pieces of an erector set - available for use in a writer's envisioned design.

This leaves bench and bar to puzzle over what we have held today. It is difficult because the opinions either soar past the record or delve into its meager content for any inference, not unlike an advocate preparing a closing argument. Nonetheless, the principal dissent and this opinion share important common ground. We agree that the summary judgment must be reversed and the case remanded for trial, although the principal dissent would go further, reversing and rendering judgment.

We agree that the ultimate question is whether the school district impermissibly preferred religion over non-religion. This agreement reflects our overarching agreement that the school district owes a duty to be evenhanded in its policies toward religion and non-religion, a duty of equality. Relatedly, we agree that context is critical in assessing neutrality. We agree with the principal dissent's observation that, "had the school district offered and factually supported a legitimate alternative explanation for its clergy only recruitment policy, it would have created a genuine issue of material fact, making a remand necessary." At the same time, this statement frames the difference

between our view and that of the dissenting opinion.  We say the record does provide that context, and the principal dissent says it does not.

The principal dissent makes our point that this case must be tried.  Each of its arguments rest on a starting premise of the facts.  For example, in assessing whether the program has a secular purpose, the principal dissent determines the question of fact on appeal finding that there is no such fit.  It then lays its accent upon the failure of the district to include other professionals in the single program it would examine.  In short, virtually all of the flaws with the program found by the principal dissent flow from its willingness to accept as fact with no trial that this was a single stand-alone program with no relevant kinship to the other programs.  With respect, asserting that the other programs are not relevant begs the basic fact question of the fit of the clergy program into the larger scheme of providing outside mentoring opportunities.

We reverse the grant of summary judgment and remand to the Chief Judge of the Eastern District of Texas for further proceedings, including trial if necessary.

REVERSED AND REMANDED.


ENDRECORD

24

E. GRADY JOLLY, Circuit Judge, joined by JONES, SMITH, BARKSDALE, EMILIO M. GARZA,[40] and DeMOSS, Circuit Judges, dissenting on the question of standing:

Article III of the Constitution requires a plaintiff to have standing to litigate; absent standing, we have no constitutional authority to consider the controversy. Here, the sole component of standing at issue is that of "injury in fact." The record demonstrates the following indisputable facts: (1) the complaint contains no allegation of an injury; (2) the plaintiffs' response to BISD's motion to dismiss for lack of standing contains no allegation of an injury; (3) the summary judgment record contains no evidence of an injury; and (4) the plaintiffs failed to articulate any argument to the district court that they have suffered an injury. Yet, mindful of these facts, a majority of the members of this court are willing to confer standing on the Does despite the Supreme Court's clear command in <u>Lujan</u>:

> The party invoking federal jurisdiction bears the burden of establishing [the elements of standing]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,'

---

[40]Judge Garza would also hold that the Does lack standing for the reasons stated in his panel dissent. <u>See</u> <u>Doe v. Beaumont Indep. Sch. Dist.</u>, 173 F.3d 274, 300-01 (5th Cir. 1999)(Garza, J., dissenting).

25

> which for purposes of the summary judgment motion will be taken to be true.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citations omitted). Further, the Supreme Court has emphasized that there is no "sliding scale of standing" that would apply a different standard to an Establishment Clause case. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 484 (1982). Instead, the same stringent requirements of standing apply regardless of the origin or nature of the right sought to be vindicated. Id. Consequently, because the plaintiffs have clearly, unequivocally, and indisputably failed to carry their burden of demonstrating that this case presents a "case" or "controversy" under Article III of the Constitution, I respectfully dissent.

Valley Forge is the only Supreme Court opinion fully to address standing in the context of a challenge to a state action under the Establishment Clause. 454 U.S. at 464.[41] Valley Forge

---

[41]Although the Supreme Court did not expressly address the issue of standing in Santa Fe Indep. Sch. Dist. v. Doe, 120 S.Ct. 2266 (2000), its most recent pronouncement on the Establishment Clause, one could point to language in the Court's opinion to argue that the "mere passage" of SFISD's unconstitutional policy caused injury to the plaintiffs. Santa Fe, 120 S.Ct. at 2281. Based on a few sentences in the Santa Fe opinion, it is arguable, then, that the Court has lowered the threshold for standing in Establishment Clause cases. Yet we cannot blithely assume that the Court intended to blur the fundamental distinction between the alleged constitutional violation and the "injury in fact" that results from the constitutional violation. The Supreme Court has unequivocally stated that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case

26

makes the following salient points: (1) "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" Id. at 471. (2) In the light of this "bedrock requirement, this Court has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." Id. (3) "The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show *injury in fact' resulting from the action which they seek to have the court adjudicate*." Id. at 473 (emphasis added). (4) "The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." Id. at 477 (citations omitted). (5) Focusing on the requirement of "injury in fact, . . . citizens generally

which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484-85 (1989); see also Shalala v. Illinois Council on Long Term Care, Inc., 120 S.Ct. 1084, 1096 (2000)(stating that the "Court does not normally overturn, or so dramatically limit, earlier authority sub silentio"); Williams v. Whitley, 994 F.2d 226, 235 (5th Cir. 1993)(stating that "absent clear indication from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled sub silentio merely because its reasoning and results appear inconsistent with later cases"). Consequently, our court is bound by the principles of standing established by the Court in Valley Forge and Lujan.

27

[can] not establish standing simply by claiming an interest in governmental observance of the Constitution, [they must] set forth instead a particular and concrete injury to a personal constitutional right." Id. at 482. Drawing on these principles, the Valley Forge Court stated:

> Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequences presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and state, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy. That concrete adverseness, which sharpens the presentation of issues, is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

Id. at 485-86. Thus, the Court held, because "we simply cannot see that respondents have alleged an injury of any kind," they lack standing to bring the current litigation. Id. at 487.

Focusing on the record in this case--and mindful of where the burden of proof lies--the plaintiffs have failed utterly to identify and prove a "particular" and "concrete" injury resulting from the implementation of the Clergy in Schools Program. The reason--indeed the wisdom--for the Supreme Court's insistence that the plaintiffs prove a concrete, palpable injury is best illustrated by the confusion among the members of the court in

28

actually determining the injury sustained by the Does.  Throughout the briefing, opinions, and discussions in this case, injury has been an exceedingly elusive target.[42]  The panel initially identified the injury suffered by the Does' in these words:

> [T]he Doe children attend schools in which the program operates, and they are continually at risk of being selected by BISD administrators, without advance notice and without parental consent. . . . The Does are not simply claiming that the Constitution has been violated in some distant place, with personal injury predicated on having been aware of or having observed conduct with which they disagree.  Quite to the contrary, the Does leave home every morning of the school year to attend schools in which the program is ongoing.  This Damoclean threat removes the Does' claim from the realm of generalized grievances and provides the degree of 'concrete adverseness' necessary for the adjudication of constitutional issues.

Doe v. BISD, 173 F.3d 274, 283-84 (5th Cir. 1999).

This judge-created injury, however, proved to be less than persuasive to a majority of the members of this court--although it now appears that Judge Wiener has returned to it in his dissenting

---

[42]In their appellate brief, the plaintiffs--addressing injury for the first time--allege that they have standing "both as private litigants and as taxpayers."  Specifically, the plaintiffs allege:
> Because BISD implements the 'Clergy in Schools' program in their children's schools and because their children are subject, at any time, to being designated by BISD to receive counseling from the Clergy, Appellants have established actual and/or threatened injury traceable to BISD's conduct.  Additionally, because BISD expends public funds on the 'Clergy in Schools' program, Appellants have standing, as taxpayers, to challenge BISD's conduct.

29

opinion.[43]  During the course of the further briefing, arguing, and consideration of this appeal, the injury has been re-characterized several times.  For example, one attempt to describe the injury was articulated as "a Catch-22 avoid-avoid dilemma of having to choose, instanter and without parental consultation, between participating in the unconstitutional Program or declining to do so and thereby subjecting himself to the potential opprobrium of his teachers and peers."  I make this reference simply to illustrate the imprecision of actual injury that results when the plaintiffs themselves fail

_____

[43]This judge-made injury is even less plausible in the light of the evidence regarding the adoption of a parental consent policy.  At oral argument before our en banc court, BISD was directed to supplement the record with evidence of the new consent policy.  In response, BISD submitted various items of evidence including the affidavit of a program coordinator stating that each school is now required to obtain parental consent for each student who participates in the program.  Further, it appears that this policy has been implemented by at least five of the BISD schools.
        Before leaping to the unsupported conclusion that standing exists because of the "Damoclean threat" that hangs over the Does "every morning of the school year" and proceeding to find a violation of the Establishment Clause, the case should at least have been  remanded to the district court for a determination of whether the injury proclaimed by Judge Wiener actually exists before spending more than a year to produce a wholly fractured decision on the substantive constitutional issue.  See e.g., Matthews v. Marsh, 755 F.2d 182, 183-84 (1st Cir. 1985)(remanding in the light of new evidence to avoid constitutional question); Concerned Citizens of Vicksburg v. Sills, 567 F.2d 646, 650 (5th Cir. 1978)(remanding in the light of intervening events so district court could determine if federal jurisdiction still existed); Korn v. Franchard Corp., 456 F.2d 1206, 1208 (2d Cir. 1972)("[W]hen circumstances have changed between the ruling below and the decision on appeal, the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances.").

to identify and prove what particular injury (or threat of injury) they have suffered.

Now, undaunted by past failures, Judge Higginbotham has recast the Does' injury once again--again without record evidence to support it.[44]  According to Judge Higginbotham, the Does' injury is

_____

[44]It should be emphasized that contrary to Judge Higginbotham's assertion in note  13, there is no evidence in the record that alleges that the Doe children wanted to participate in the Clergy in Schools Program, or that as a result of the program's "religious content," they have been injured or threatened with injury.  The evidence that Judge Higginbotham struggles to construe as supporting his judge-created injury is (1) the correspondence sent by the Doe parents to the BISD before filing suit that indicated that lay officials should participate in the Program, and (2)  the testimony of one parent and three affidavits of other parents that were attached to the Does' response to BISD's motion for summary judgment that raise objections to how the program was being conducted (e.g., "I believe the Clergy in Schools program should be broadened to include people from other walks of life;" "I am particularly concerned that BISD has not notified me that this program was being administered;" and "I'm simply asking one thing, and that is to do something to redefine, to redevise this program where  . . . it would include other professionals and not focus on religious leaders").   Neither the letters nor the evidence attached to the Does' response to BISD's motion for summary judgment indicated whether the Doe children wanted to participate in the program--or for that matter, in any counseling program--or that the Doe children were in some way being injured as a result of the program's "religious content."  Consequently, it is hard to imagine how Judge Higginbotham can find any support for his alleged injury in these portions of the record.

Judge Wiener's dissenting opinion  again returns to Greek mythology to create a Damoclean-like injury sufficient to convey standing upon the Does:

> [T]he Does have presented ample record evidence  to show that every single day that their children attend school they are subjected to the threat of a constitutional injury. . . .  The Does . . . object to their children's being forced personally to run the risk every day of being subjected to a religion-endorsing program  that operates in their very own schools.  This ever-present, tangible risk, faced in the very school buildings that

31

the denial of access to the "full curriculum offered by the school":

> There is little doubt that limiting access to the full curriculum offered by the school would injure these students. . . . Opportunities for counseling and mentoring services are a needed and valued component of public education.  The District supported this mentoring program with its money and resources.  At bottom, the claim is that the program unconstitutionally prefers religion over non-religion, that the students cannot participate in the school's offered program without taking part in an unconstitutional practice.  If found at trial, this works a deprivation of a student's right not to be excluded from the benefits of a school-financed educational offering--a concrete, judicially cognizable injury.[45]

---

> they are compelled by law to attend, is more than sufficient to vest the Does with Article III standing, as injured parties, to bring their complaint.

This "ample record evidence" remains  unidentified, a secret safeguarded from the rest of us.  It does seem that some plaintiff would have at least observed this omnipresent threat that is a feature of his/her daily life.   There is not, however, a scintilla of evidence in the record to suggest that any plaintiff ever felt "threatened" by the Clergy in Schools Program.

It is worth noting that the completely different arguments with respect to standing offered by Judge Higginbotham and Judge Wiener underscore the total absence of any alleged injury or proof of injury in the record.  These arguments make pellucid  that the different injuries asserted by them are  simply judge-created.

[45]To conclude that the Does have suffered an injury, it is necessary for Judge Higginbotham to brush aside Supreme Court authority and to rely on three opinions of our sister circuits. After reviewing these opinions, it is still unclear where the support for Judge Higginbotham's conclusion can be found.

In Foremaster v. City of St. George, 882 F.2d 1485, 1490 (10th Cir. 1989), the plaintiff "alleged that he suffered economic injury because the subsidy [paid by the city owned power company to light a local Mormon temple at night] caused him to pay higher rates for electricity." Id. at 1487.  The court, relying on evidence in the record establishing that the plaintiff had bought electric power from the city between 1983 and 1987, held that as a result of the city's expenditure of funds to pay for the lighting of the temple,

32

This newly minted injury, however, fares little better than its predecessors when analyzed in the light of <u>Valley Forge</u> and <u>Lujan</u>. The supposed individualized injury of denial of full

---

the plaintiff had "suffered a 'distinct and palpable' injury." <u>Id.</u> at 1487-88. The court reasoned that "[t]o the extent that this subsidy diminished total revenues for the City's Utility Department, the Utility Department and the purchasers of electricity are less well off and those purchasers may very well pay higher rates." <u>Id.</u> at 1487.

In <u>Hawley v. City of Cleveland</u>, 773 F.2d 736 (6th Cir. 1985), the plaintiffs specifically alleged in their complaint "that they 'regularly use Cleveland Hopkins International Airport'" and that the "presence of a sectarian chapel at Cleveland Hopkins impairs [their] use and enjoyment of the public facility." <u>Id.</u> at 739. The court, holding that the plaintiffs had suffered a sufficient injury to convey standing stated: "Even if [the plaintiffs] can avoid the chapel area by utilizing different concourses or stairways, this impingement on their right to use the airport is sufficient to confer standing since it would 'force them to assume special burdens' to avoid 'unwelcome[d] religious exercises.'" <u>Id.</u> at 740; <u>see also</u> <u>ACLU v. City of St. Charles</u>, 794 F.2d 265, 269 (7th Cir. 1986)(stating that the plaintiff's testimony "that she detours from her accustomed route to avoid the cross when it is lit . . . is all that is needed to enable the suit to be maintained").

Finally, in <u>Bell v. Little Axe Indep. Sch. Dist. No. 70</u>, 766 F.2d 1391 (10th Cir. 1985), the "[t]estimony in the record indicat[ed] that other students asked the [plaintiffs] why they had not chosen to attend the meetings, asserting that they therefore must not believe in God." <u>Id.</u> at 1196. Further, the plaintiffs' parents testified that "they have the right to guide their children's religious education without interference at school." Finally, testimony was offered that indicated that the plaintiffs' parents were forced to remove their children from the public school they attended "because of the continuing harassment generated by the lawsuit." <u>Id.</u> at 1399. Thus, the court concluded that the plaintiffs "had standing to bring this lawsuit." <u>Id.</u>

In each of the three cases cited by Judge Higginbotham, the plaintiffs specifically alleged that they suffered definite particularized injuries resulting from the challenged conduct. Further, in each of these cases, the plaintiffs offered evidence in support of these alleged injuries. These two critical facts are absent in the case before us where the injury is purely judge created.

33

participation in the school's curriculum, is, if it exists at all, remote, abstract, and nonconcrete. No Doe has ever indicated that he or she wants counseling services. The record is clear that none of the Does has ever been asked to participate in the program. No evidence exists that the Doe children will ever be selected for the program. Thus, the injury suffered by the Does cannot be the deprivation of the actual opportunity to participate in the full curriculum of the school, because none of the Does either have been selected for the program or have shown that they are potential candidates for selection.

Consequently, the injury (or threat of injury) created by Judge Higginbotham from a wanting record can be reduced to one arising from the unalleged, unproved possibility that if one of the Doe children were to be asked to participate in the Program, he or she might be compelled to refuse because of religion-based objections, and thus be denied the benefit of counseling that the particular program (Clergy in Schools) offers--a program in which he or she may not wish to participate in any event. As we have noted, because the record was not developed with this injury in mind--or for that matter with any injury in mind--the plaintiffs have failed to carry their burden of establishing that such an injury is concrete as opposed to merely hypothetical or speculative.[46]

---

[46]The plaintiffs have failed to offer any evidence demonstrating that the Doe children fall into any one or more of

34

I stress what I have previously stated: The Supreme Court has stated on numerous occasions that the injury suffered by the plaintiff must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Abstract injury is not enough." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). Remote threat of injury is not enough. Id. "The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct. . . ." Id. Stated differently, the Supreme Court has "emphasized repeatedly, [the injury] must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)(citations omitted).[47] Further, the Supreme Court

_____

the categories that would make them eligible for selection into the Clergy in Schools Program. Although the categories are defined in very broad terms, they nonetheless identify a specific set of criteria upon which the school is to rely in identifying potential participants for the program. In the absence of evidence indicating which characteristics the Doe children possess, it is impossible to determine whether they would have been eligible for selection.

[47]The Supreme Court's most recent opinion addressing standing expressly acknowledges these principles. See Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167, 180-81 (2000) (quoting Lujan, 504 U.S. at 560-61). In Laidlaw, the Court began its discussion of standing by stating: "The relevant showing for purposes of Article III standing . . . [is] injury to the plaintiff." Id. at 181. The Court then went on to outline in

has made clear that the burden of establishing the presence of such a concrete and palpable injury falls squarely on the shoulders of the plaintiff.  See Lujan, 504 U.S. at 561.  It is incontrovertible on the record in this case--and neither Judge Higginbotham nor Judge Wiener denies this fact--that the plaintiffs have failed, completely and totally, to offer allegations or proof of an injury.

Finally, it is important to note that my disagreement with the majority of the members of this court is not that the plaintiffs could have under no set of circumstances alleged and offered sufficient evidence of "injury in fact."  Instead, my disagreement is solely that the plaintiffs in this case have failed even to allege--much less offer any proof of--any injury suffered as a result of attending schools that participate in the Clergy in Schools Program.  Consequently, because a majority of the members of this court, without citing any authority that would permit them to do so, are willing to create an injury when none has been alleged and proved, I must respectfully dissent.

ENDRECORD

---

great detail the numerous affidavits and depositions in the record that establish the existence of an injury to the "affiants' recreational, aesthetic, and economic interests."  Id. at 183-84. Thus, the Court concluded that "[t]hese sworn statements, as the District Court determined, adequately documented injury in fact." Id. at 183.

EDITH H. JONES, Circuit Judge, join by SMITH, BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges, dissenting:

We respectfully dissent from the decision to remand this case for further proceedings in the district court.

One must pity the parties and the district court when, or if, they grapple with remand. Since there is no majority legal rationale to follow, they need a hint: count heads. Eight of us say that the clergy in schools (CIS) program is or may be constitutional, six say it can never be so, and one abstains on the merits for jurisprudential reasons. To read the three "remanders," who quote often and approvingly from the "principal dissent," the reader might not remember where they came out. But they appear to conclude that CIS can play a constitutionally approved role in the Beaumont Independent School District if it has a secular purpose and if it is arrayed among other voluntary programs that teach similar shared civic values. While posing as the sensible middle between contentious factions, the remanders' position nevertheless inflicts damage -- on a sense of legal proportion and on the already-turbid law of the Establishment Clause.

## I.  NO SENSE OF PROPORTION

What is the value of remand here? The remanders never clearly state what additional facts may be proved in order to establish the heretofore uncontested proposition that BISD had a

37

legitimate secular purpose for creating the CIS program.[48]  It is both legitimate and secular to invite semi-official visitors to campus to reinforce in public school students the existence and the desirability of conforming to shared standards of community morality.  Placing emphasis on the substance of the program, rather than on the irrelevant and wholly personal, unofficial motives of a few of the program's supporters, there is no genuine issue of material fact that needs further development.

Similarly opaque is the remanders' discussion about what further information the district needs to elicit concerning other volunteer programs in order to prove its religious "neutrality." Our legal objections to this holding will be discussed shortly. What is troubling at this point is the idea that the school district must spend additional tens of thousands of dollars in attorneys' fees to defend a program that may reach 60-70 students in the high school twice a year for a total of four hours.[49]  CIS is a program of exceedingly modest scope and exceedingly stringent limitations on its clergy participants.  If this tiny innovation in community values-based education must run a prohibitively expensive legal gauntlet, then the remanders' position can hardly be differentiated in practical terms from Judge Wiener's dissent.

---

[48]The original panel majority opinion did not quarrel that this first prong of the Lemon test was satisfied.  See Doe v. Beaumont ISD, 173 F.3d 274, 287 (5th Cir. 1999).

[49]The number of students potentially affected in other BISD schools is similarly small.

Rational school districts cannot afford to litigate over similar innovations and will be discouraged from pursuing any initiatives that call into question their appearance of neutrality between religion and non-religion.  The remanders' position may ultimately vindicate BISD, but at great cost to schools' autonomy and creativity in addressing the pressing subject of values-based education.

## II.   ESTABLISHMENT CLAUSE CONFUSION

Unlike the remanders and Judge Wiener's dissent, we are not constitutionally concerned about the alleged pro-religious symbolism connoted by the Clergy in Schools program, nor would we chide the Beaumont school board for making "a difficult case out of an easy one" by excluding lay counselors from this volunteer program.[50]  The  other opinions are unnecessarily overwrought by the Allegheny endorsement test, which has been applied only to prohibit government-sponsored religious speech.  The more clearly analogous cases[51] are those that "endorse" government's sending "even a cleric" to perform wholly secular tasks.

The   endorsement   test   "preclude[s]   government   from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred."  County of

---

[50]Several of us concur in Judge Jolly's separate opinion on standing, but we reach the merits because the rest of the court does so.

[51]And it must be admitted that hardly anything is "clear" under the Court's Establishment Clause caselaw.

39

Allegheny v. ACLU, 492 U.S. 573, 593, 109 S.Ct. 3086, 3101 (1989) (quoting Wallace v. Jaffree, 472 U.S. 38, 70, 105 S.Ct. 2479, 2497 (1985)).  The content of the CIS program does not do so.  By its very nature and proven operation, the CIS program does not inculcate religious beliefs or practices.  Quite the contrary, the record refutes any suggestion of improper proselytizing by the clergy volunteers.[52]  The volunteers are required to shed all evidence of their profession -- from clerical collars to scriptural quotations -- in order to participate.  The facts that the purpose and operation of the program are wholly secular, and that the Does find no constitutional fault in the content of the program, reinforce that there is no government-sponsored religious speech and no inculcation or endorsement of religious beliefs.

The Does contend instead that because clergy are exclusively involved in the program, the District has singled them out for special status and has effected "a symbolic union" with organized religion.  This argument fails for at least three reasons.  First, Supreme Court caselaw does not support this contention.  Agostini expressly disavowed the presumption applied in earlier Court cases that the presence of government-subsidized teachers or assistants on parochial school premises inherently involves unconstitutional indoctrination or symbolic union.

_____

[52]The one instance in which a volunteer quoted scripture and was reproved is the exception that, on this record, proves the rule.

Agostini v. Felton, 521 U.S. 203, 222, 117 S.Ct. 1997, 2010 (1997);
see also Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1,
12-13, 113 S.Ct. 2462, 2468-69 (1993).  In the same way, it should
not be presumed that the presence of clergy on a public school
campus automatically raises constitutional questions.[53]  If
anything, given the fact that in some religious denominations, non-
ordained pastors and religious workers support themselves by
holding teaching positions, no such assumption is warranted.

Further support for this conclusion is found in a series
of cases in which the Court emphasizes that the government may send
"even a cleric" to perform a secular task.  Bradfield v. Roberts,
175 U.S. 291, 298, 20 S.Ct. 121, 123 (1899) (holding that the
religious affiliation of a hospital was "wholly immaterial" to the
Establishment Clause analysis);  Roemer v. Bd. of Pub. Works of
Maryland, 426 U.S. 736, 746, 96 S.Ct. 2337, 2344 (1976).  In Bowen
v. Kendrick, the Court approved the facial constitutionality of a
federal statute that subsidized both religious and nonreligious
organizations to counsel pregnant, unwed teenagers in nonsectarian
matters.  Bowen, like Agostini, distinguished between aid that
serves religious and that which serves nonsectarian functions.[54]

---

[53]See McDaniel v. Paty, 435 U.S. 618, 629, 98 S.Ct. 1322, 1329
(1978) ("[there is]no persuasive support for the fear that
clergymen . . . will be less careful of anti-establishment
interests . . . than their unordained counterparts.").

[54]The Court also stated in Bowen: ". . . there is nothing
inherently religious" about the activities of education and
counseling authorized by the federal statute.  487 U.S. at 605; 108

And in <u>Bowen</u>, the Court rejected the "symbolic union" argument in a more complex situation than is presented here. The counseling programs authorized by Congress could occur off-campus, in and around religious facilities, and there was no prohibition, as there is in the CIS program, of one-on-one counseling. Continuous monitoring of the counseling was not required, and the program contemplated that individual unwed mothers could be counseled by members of one religious organization. <u>Bowen</u> refused to presume that the statute would be implemented in an unconstitutional manner. 487 U.S. at 611-12, 108 S.Ct. at 2575-76. The decision holds that religious agencies may be assigned and even subsidized by government to perform secular tasks under appropriate guidelines. <u>Bowen</u> would seem to ordain the approval of a program like CIS, which enforces even more rigorous guidelines for secular counseling and uses clergy as sporadic, unpaid volunteers.

Second, as *Rosenberger* makes clear, courts must focus "on the nature of the benefit received by the recipient." <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 843, 115 S.Ct. 2510, 2523 (1995). In funding cases, the benefit is apparent -- financial assistance. In order for a funding program to pass the endorsement test, the government cannot define the recipients of aid by reference to religion or otherwise encourage religious activity as a condition of receipt of aid. <u>Agostini</u>, 521 U.S. at

S.Ct. at 2572.

42

230-31, 117 S.Ct. at 2014.  But this criterion does not apply in the present case because neither subsidies nor religious activities are involved.  Moreover, there is no evidence that students were invited to participate in CIS because of any religious test or affiliation.  Thus, any benefit to religion is too attenuated to violate the Establishment Clause.  As the Court noted in *Bowen*, "religious organizations can help solve the problems to which the [program] is addressed.  Nothing in our previous cases prevents [BISD] from making such a judgment or from recognizing the important part that religion or religious organizations may play in resolving certain secular problems... To the extent that this ... recognition has any effect of advancing religion, the effect is at most 'incidental and remote.'"  <u>Bowen</u>, 478 U.S. at 607, 108 S.Ct. at 2573.[55]

Finally, the Does' argument that the flaw in the program is its exclusive reliance on clergy proves too much.  Clergy members are not inanimate religious symbols whose mere presence in

---

[55]The remanders' opinion asserts that this analysis of the status of the CIS program within BISD's panoply of volunteer counseling programs is ambiguous.  We disagree.  First, the fact that CIS was treated no differently from other volunteer programs reinforces the conclusion that any benefit to or preference for religion was incidental and remote.  See <u>Bowen</u>, <u>supra</u>, 478 U.S. at 607, 108 S.Ct. at 2573.  Second, to the minor extent that <u>Allegheny</u> is relevant to this case, we agree with the majority that the proper context in which to consider the possible endorsement of religion is the full scope of the BISD volunteer programs, not the novel "single decisional element" test espoused by the dissent.  If anything, it is the remanders' novel "thick and thin" theory of religious neutrality that is ambiguous.

43

a school generates constitutional suspicion.  Compare Allegheny, supra.  Indeed, in Roemer, the Court upheld a government subsidy to Maryland's schools of higher education though well aware that in most of the recipient schools, priests wearing clerical garb would teach the subsidized classes.  Roemer, 426 U.S. at 756, 96 S.Ct. at 2350; see also Bradfield, supra.  Critically, however, those classes were secular.  Likewise, the presence of clergy volunteers should not alone imply endorsement.[56] Their prescribed message is secular.  The clergy members were avowedly recruited because of their expertise in counseling, communication, and understanding of the community -- in other words, for their secular, not their religious skills.[57]  The District no more endorsed religion by sponsoring CIS than it would by inviting a speaker like Archbishop Desmond Tutu or Rabbi Hyman to deliver a non-proselytizing address to the students.

---

[56]As Justice Brennan notes in Paty, the Establishment Clause "does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities."  435 U.S. at 641, 98 S.Ct. at 1335 (Brennan, J., concurring).

[57]Whether or not this court subscribes to the District's attribution of unique counseling and communication skills, as well as specific training in ethics, to the clergy is not constitutionally relevant.  School districts are free to experiment with the curriculum, particularly in areas as important as the inculcation of fundamental shared civic values, so long as they do not prescribe religious exercises or compel assent to religious belief.

Because we believe that the relevant cases here are _Agostini_, _Bowen_, _Roemer_, and _Bradfield_, and that _Allegheny_'s test offers more chance for mischief than clarification in the school context, we dissent from remanding this case and would affirm the district court's judgment that it is constitutional as a matter of law.

WIENER, Circuit Judge, joined by POLITZ, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges, concurring in part and dissenting in part:

Even though I agree with a majority of the fifteen judges comprising this en banc court[58] that (1) the Does have standing to bring their claims, (2) the district court improvidently granted summary judgment to the Beaumont Independent School District (sometimes "BISD" or "the School District"), and (3) the ultimate question in this appeal is whether Clergy in Schools (sometimes "the Program") is neutral toward religion, I am constrained to write separately for two principal reasons: First, because, like the five other judges who join me to form today's six-judge plurality,[59] I am convinced that the record in this appeal is more than sufficient to support a summary judgment that the Program is unconstitutional; and second, because a tiny minority of three out of fifteen judges ("the Controlling Minority"[60]) has managed to consign this three-year-old appeal to jurisprudential limbo (if not purgatory) by remanding it to the district court, even though the remaining twelve judges

_____

[58] Since the granting of en banc review in this case, Judge Politz has elected senior status. He remains, however, a member of the en banc court by virtue of his active status at the time that en banc review was granted.

[59] See Black's Law Dictionary 1154 (6th ed. 1990) ("[a]n opinion of an appellate court in which more justices join than in any concurring opinion (though not a majority of the court)").

[60] See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.").

46

stand ready to dispose of the case, one way or the other, on the existing record.

The "silver lining" of this otherwise clouded result is that nine of fifteen judges now agree that, when reduced to its essentials, this case turns on a single substantive issue: Does a government decision-maker violate the Establishment Clause by using status as a clergyman as the sole criterion for recruiting participants to staff and run a government-created public school program, i.e., when the one and only selection criterion is patently not neutral toward religion?  Both now and on remand, when applied to the challenged Program, this one question encapsulates the entire Establishment Clause analysis in this case, primarily the assessment of the Program's neutrality toward religion, but also its endorsement effect and its compliance with each of the three disjunctive prongs of Lemon.[61]  So, even though nine of the fifteen judges who considered the en banc rehearing are in full agreement that the case turns on that question, and twelve of the fifteen judges are ready to answer it, one way or the other, based on the summary judgment evidence before us today, this case is being remanded —— a quintessential example of the tail wagging the dog.

As for the nine of us who agree that this case turns on whether Clergy in Schools is neutral toward religion, the three judges comprising the Controlling Minority part company with the remaining six of us when it comes to the frame of reference within which to test the constitutionality of the Program.  The Controlling Minority constructs a huge —— and, in my

---

[61] Lemon v. Kurtzman, 403 U.S. 602 (1971).

47

view, vastly overbroad — framework: the School District's entire School Volunteer Program, which the record amply shows to be no more than a hodgepodge of disparate activities furnished to BISD by pre-existing, external organizations — not a cohesive, coordinated group of programs created or assembled by BISD — with one exception: Clergy in Schools, the only volunteer program created "from scratch" by BISD. More importantly, it is the only volunteer program that, from the very beginning, has been staffed by "volunteers" actively recruited by BISD; and, most importantly, BISD has used religious ordination as the sole litmus test for recruiting these volunteers. In addition, the Controlling Minority has subtly substituted the Equal Protection Clause for the Establishment Clause, impermissibly framing the ultimate issue in terms of "equality of treatment" rather than the neutrality that the Constitution demands.[62] This simply cannot be squared with the position taken in June 2000 by five Justices of the Supreme Court who agreed in Mitchell v. Helms that "our most recent use of 'neutrality' to refer to generality or evenhandedness of distribution . . . is not alone sufficient to qualify [government] aid as constitutional."[63]

The Program's exclusionary recruitment criterion and its facial lack of neutrality have convinced the six-judge plurality for whom I write today

---

[62] See Controlling Minority Opinion at 2 ("The ultimate question in this Establishment Clause case is equality of treatment: whether the school board preferred religion over non-religion.").

[63] __ U.S. __, 120 S.Ct. 2530, 2557-58 (2000) (O'Connor, J., concurring) (punctuation and citation omitted).

to choose a much narrower framework than that confected and applied by the Controlling Minority.  For the six of us, I shall proceed to test the Program's neutrality on its own elements — as we must — even though, for context and contrast, I shall also consider and compare features of other volunteer programs to confirm the uniqueness of Clergy in Schools.

The wide-angle lens fabricated by the Controlling Minority works to obscure the core issue of this appeal, the Program's neutrality toward religion, by laying a smokescreen of wholly unrelated, truly voluntary programs that are (1) furnished to BISD (not created by it) by pre-existing, external, wholly secular organizations and (2) conducted by their own members (who are not selected by BISD).  Only by thus unduly broadening the framework for its analysis, from the specific program under challenge, i.e., Clergy in Schools, to the entire School Volunteer Program, can the Controlling Minority craft a rationale to support a remand.  In fact, quite recently, our colleagues of the Sixth Circuit repudiated the Controlling Minority's notion that if a "set of [government] programs together comprise a mosaic that is neutral with regard to religion, then the Establishment Clause is not offended."[64]  In Simmons-Harris v. Zelman, that court was unpersuaded by the government's argument that other, secular educational options available to parents were in any way even relevant to the Establishment Clause analysis of the challenged school voucher program.[65]

---

[64] See Controlling Minority Opinion at 2.

[65] No. 00-3055/3060/3063, 2000 WL 1816079, at *12 (6th Cir. Dec. 11, 2000) ("Analyzing the scholarship program choices as compared to choices or schools outside the program is asking this Court to examine the entire context of Ohio education.  Such a

The court thus flatly rejected the government's effort to expand the frame of reference for its Establishment Clause analysis beyond the one school program that had been challenged.[66]  Like the voucher program, Clergy in Schools is a free-standing government program, which must therefore be tested <u>independently</u>.

Moreover, the Controlling Minority's avowed purpose of remand is to adduce evidence that I see as not only irrelevant and immaterial but also nonexistent.  Indeed, were there evidence of multiple volunteer groups being coordinated by the School District to indoctrinate comprehensively the students of Beaumont public schools in morals and civic virtues, BISD's able counsel would surely have gotten it into the record.

More astonishing is the fact that BISD has never advanced that it solicits or accepts any other volunteer efforts, much less secular ones, for the purpose of inculcating morality and civic virtues in the students. To the contrary, counsel for the School District candidly admitted at oral argument that Clergy in Schools is the <u>only</u> program designed by BISD to address morality and civic virtues.  Yet the Controlling Minority has now "lawyered" this fiction of "programs similar in purpose and function" <u>for</u>

---

question is not before this court. . . . [T]he school voucher program, and only the school voucher program, was challenged by Plaintiffs in this lawsuit. . . . We may not view these two programs as inextricably interdependent when the plain language of the statutory scheme demonstrates the opposite. . . . [W]e are presented only with the question of whether the school voucher program violates the Establishment Clause, and we must limit ourselves to that issue, regardless of the temptations Defendants' arguments present.").

[66] <u>Id.</u>

the first time on appeal — a ploy that would be summarily dismissed on grounds of waiver if BISD's lawyers had tried it. The most regrettable side effect of this judicial overreaching is the sweeping of this 3-year-old appeal back under the carpet for the untold additional years it will take for the district court to conduct a futile evidentiary exercise to adduce facts that, even if they existed, would be irrelevant and immaterial, and for us to hear another appeal and, quite likely, another rehearing en banc.

When Clergy in Schools is tested, as it should be, in the proper frame of reference, remand is seen to be entirely futile and unnecessary. As I shall demonstrate, the record is more than sufficient to test the Program for neutrality toward religion — and thus for this court to vote it up or down on summary judgment — without causing the hollow act of a regrettably lengthy, costly, wasteful, and (it seems to me) improvident remand.[67]

I.

---

[67] As the primary purpose of this dissent is to demonstrate that the Does are entitled to summary judgment, I shall throughout this opinion construe the facts in the light most favorable to the School District. Under the summary judgment standards recently articulated by the Supreme Court, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. __, 120 S.Ct. 2097, 2110 (2000).

*The Neutrality Principle:* County of Allegheny v. ACLU[68]

The Supreme Court has repeatedly held that the Establishment Clause requires the government to maintain "a course of neutrality among religions, and between religion and nonreligion."[69]  The granting of preferential treatment according to a purely religious criterion indisputably creates a strong perception of government endorsement of religion,[70] and at times may even directly aid the religiously affiliated in the pursuit of their sectarian endeavors.[71]  Endorsement of and direct aid to religion are equally proscribed by the Establishment Clause, and both have consistently been held by the Supreme Court to have the

---

[68] 492 U.S. 573 (1989).

[69] See Bowen v. Kendrick, 487 U.S. 589, 607 (1988).  See also School Dist. of Abington Twnshp. v. Schempp, 374 U.S. 203, 225 (1963) (striking down a school program because of its "breach of neutrality"); Roemer v. Bd. of Public Works of Maryland, 476 U.S. 736, 747 (1976) ("Neutrality is what is required"); Bowen, 487 U.S. at 607 (upholding a grant program that "reflect[ed]... [a] successful maintenance of a course of neutrality among religions, and between religion and nonreligion"); Wallace v. Jaffree, 472 U.S. 38, 60 (1985) (ruling that the characterization of prayer as a favored practice "is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion"); Bd. of Education of Kiryas Joel Village School Dist. v. Grumet, 512 U.S. 687, 709 (1994) ("the statute before us fails the test of neutrality."); Mitchell, 120 S.Ct. at 2541 (2000) (plurality) ("we have consistently turned to the principle of neutrality").

[70] See Kiryas Joel, 512 U.S. 687.

[71] See, e.g., Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989) (plurality) (invalidating a tax exemption applicable only to religious publications).

impermissible primary effect of advancing religion.[72]  This is why those of my learned colleagues who today would refuse to hold Clergy in Schools unconstitutional have not been able to cite a <u>single</u> <u>case</u> in which the Supreme Court has upheld the government's use of a religion-preferring selection criterion.

The non-neutrality of the Program's recruitment criterion endorses religion <u>symbolically</u>.  By exclusively recruiting members of the clergy to instruct students in civic virtues and morality, the School District holds the clergy up to its students as those members of the community who are uniquely best-qualified to perform that task.[73]  This unmistakable symbolic endorsement of religion strikes at the core concern of the Establishment Clause: The protection of citizens from the specter of government interference and favoritism in the inextricably intertwined domains of conscience, religion, and morality.  Furthermore, the Supreme Court has consistently applied a heightened level of scrutiny in the hyper-sensitive

---

[72] <u>See</u>, <u>e.g.</u>, <u>Wallace</u>, 472 U.S. at 60 (striking down a moment of silence "enacted ... for the sole purpose of expressing the State's endorsement of prayer activities"); <u>Texas Monthly</u>, 489 U.S. at 17 (tax exemption limited to religious periodicals "effectively endorses religious belief"); <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 593-94 (1989) ("The Establishment Clause, at the very least, prohibits government from . . . making adherence to a religion relevant in any way to a person's standing in the political community") (punctuation and citation omitted).

[73] <u>See</u>, <u>e.g.</u>, <u>Bowen</u>, 487 U.S. at 604-05 (observing that the government is not allowed to convey the message that a religiously affiliated group is uniquely well-qualified to perform a particular task).

venue of public education.[74]  In our public schools, more than anywhere else, assiduous attention to neutrality is mandated by the Establishment Clause.

Only by <u>mis</u>reading and <u>mis</u>applying the Supreme Court's plurality opinion in <u>County of Allegheny v. ACLU</u>,[75] I submit, can the Controlling Minority conclude that the symbolic endorsement effect of BISD's exclusive recruitment policy may somehow be <u>neutralized</u> or <u>diluted</u> merely by swallowing the nostrum of "other programs similar in purpose and function"[76] operating within the School District's eclectic volunteer groups.  The fundamental difference between the Controlling Minority's manufactured framework, in which the constitutionality of the School Volunteer Program as a whole —— which has <u>never</u> been challenged —— must be tested, and my framework, in which the constitutionality of Clergy in Schools' recruiting and staffing criterion is tested independently, becomes crystal clear in the context of a proper reading of <u>Allegheny</u>.

In <u>Allegheny</u>, the Supreme Court separately tested the endorsement effects of two separately displayed religious symbols, a crèche[77] (the sole

---

[74] <u>See</u>, <u>e.g.</u>, <u>Edwards v. Aguillard</u>, 482 U.S. 578, 583-84 (1987).

[75] 492 U.S. 573 (1989).

[76] <u>See</u> Controlling Minority Opinion at 2.

[77] A "crèche" is a tableau of the stable scene at Bethlehem, with the infant Jesus surrounded by the adoring Mary, Joseph, shepherds, and magi.

symbol in a seasonal display inside the County Courthouse), and a menorah[78] (one of several symbols comprising an outdoor seasonal display on public property one block from the County Courthouse).  The scenes that the Court separately examined were but two among the Pittsburgh community's numerous seasonal holiday displays. Importantly, the Court did not examine either religious symbol (the menorah and the crèche) or either government display ("Salute to Liberty" and the manger scene) as components of the community's overall Christmas/Hanukkah/New Year's seasonal display program — like BISD's School Volunteer Program, a loose amalgamation of disparate public groups and entities involving separate governmental decisions. Rather, the Court tested each display and each symbol separately, essentially in a vacuum.  The reason for the Court's independent evaluation of the two displays and the two otherwise sectarian symbols is obvious: Even though both symbols and both displays celebrated the same set of year-end holidays, each conveyed a vastly separate and distinct message.  Implicit in the Court's methodology is recognition of the constitutional truism that no message conveyed by the government may have the effect of endorsing religion: The government does not somehow earn a "free shot" to convey a message that does endorse religion simply by conveying other messages that do not.[79]

---

[78] A "menorah" is a candelabrum used in the celebration of Hanukkah.

[79] So, for example, a public school cannot, by virtue of having offered religion-neutral courses such as history and chemistry, empower itself to offer a religion-fostering course in, say, Jewish theology, scripture and prayer.

55

In <u>Allegheny</u>, the Court evaluated the endorsement effect of each challenged religious symbol and display by focusing on the <u>message</u> that the government's choice of each communicated, i.e., "'what viewers may fairly understand to be the purpose of the display.'"[80] The Court concluded that the menorah, which was located next to a Christmas tree more than twice its height and a sign reading "Salute to Liberty," conveyed a secular message of "pluralism and freedom of belief during the holiday season" and thus did not endorse religion.[81]  In contrast, the Court found that the County's display of the crèche violated the Establishment Clause by "sen[ding] an unmistakable message that [the County] supports and promotes the Christian praise to God that is the creche's religious message."[82]  The Court concluded that the crèche display had clearly been <u>independently selected</u> by the County to convey a message <u>separate and distinct</u> from those of other public displays in the community.  Although in one sense the crèche display, like the "Salute to Liberty" display, was part of a much broader, perfectly constitutional community-wide celebration of the season, in another sense the religion-endorsing message conveyed by that one, single-symbol display rendered it —— but not the community's holiday celebration as a whole —— unconstitutional.  More significant is the obverse: The fact that the community's celebration as a whole was constitutional could not

---

[80] <u>Allegheny</u>, 492 U.S. at 595, quoting <u>Lynch v. Donnelly</u>, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring).

[81] <u>Allegheny</u>, 492 U.S. at 635 (O'Connor, J., concurring).

[82] <u>Allegheny</u>, 492 U.S. at 600.

rescue, through "equality" or dilution, the government's crèche display from its unconstitutional endorsement of religion.

Even though the Controlling Minority acknowledges that the School District's clergy-only recruitment policy "suggests that [the clergy] have been chosen as a group because of a perceived expertise in the field of civic values and morals,"[83] it nevertheless insinuates that the overarching aegis of the School Volunteer Program may somehow so dilute any message of endorsement as to neutralize the Program's otherwise unconstitutional preferring of religion.[84]   The Controlling Minority, however, mistakes Allegheny Court's emphasis on the importance of the particular physical setting of the religious symbol displayed —— whether, e.g., in a museum, which would neutralize any message of endorsement, or in the seat of county government, which would strengthen any endorsement effect, or in a public school, where the Establishment Clause must be applied "with special sensitivity"[85] —— for the appropriate context in which to conduct the constitutional analysis.   The Court in Allegheny made clear that the presence of "Santas or other [secular] Christmas decorations" elsewhere in the same building that housed the crèche failed to negate, neutralize, or immunize the latter's endorsement effect.[86]   Not even the penumbra of the

---

[83] See Controlling Minority Opinion at 19.

[84] Id.

[85] The Court explicitly noted that even the display of a menorah alongside a Christmas tree might raise additional constitutional questions if located in a public school.   See Allegheny, 492 U.S. at 629 n.69.

[86] Id. at 598 n.48.

57

community-wide holiday celebration program was deemed sufficient by the Court to sanitize the unconstitutionality of the message of endorsement inherent in the display consisting entirely of that one religious symbol.

There is simply no support to be found in <u>Allegheny</u>, then, for the Controlling Minority's novel theory that the existence of neutral, secular programs similar in purpose and function within the School District could somehow rescue Clergy in Schools —— a non-neutral program that, as the Controlling Minority clearly (if not expressly) acknowledges, would have to be held unconstitutional if tested alone on the extant record. In <u>Allegheny</u>, the local government's use of one religious symbol (the menorah), together with other neutral symbols, to convey a secular message could not legitimate the unconstitutional endorsement effect of the government's use of a separate, free-standing symbol (the crèche) that did convey a religious message only. How, then, could the presence of other, religion-neutral volunteer programs in the schools of Beaumont possibly legitimate the unconstitutional endorsement effect of the clergy-only recruitment policy used by the School District to staff Clergy in Schools? The obvious answer is that it could not and does not. The School District was constitutionally obligated to use a religion-neutral selection criterion to recruit the staff for the Program, and it not only failed to do so, it flatly refused to do so.

Direct evidence already in the record establishes that the School District refused several parental requests to integrate secular professionals into the Program: This cannot be explained on any but religious grounds. Onlookers in the Beaumont community and, more to the

58

point, students in BISD's schools, cannot help but conclude that the School District recruited the clergy, to the exclusion of all others, to staff its morals and ethics program precisely because it agrees with and exalts the quasi-religious brand of morality that BISD assumes the clergy will convey.[87]

There can be no serious question that, in creating and staffing Clergy in Schools, the School District has overtly advanced religion by granting preferential status to the clergy. Despite boldly (and, based on the summary judgment evidence, pretextually) rationalizing its clergy-only criterion as a proxy for communication skills, the School District has made no effort to identify a subset of skilled communicators among the set of all local clergymen. BISD's invitations went out to any and every member of the community whom the School District could identify as an ordained or self-proclaimed minister. And BISD did so without making any effort whatsoever to consider, much less determine, other religion-neutral credentials or qualifications of these ministerial invitees. The School District even ignored warnings voiced by one of its own hand-picked clergy participants that it had cast its clergy-only net too widely, recruiting many ministers who had no formal training in interpersonal counseling.[88]

---

[87] It is hardly a coincidence, then, that the newspaper article that originally alerted the Does to the Program begins, "In an age when police officers roam the halls to enforce the peace, Beaumont school Superintendent Carroll Thomas would like to see ministers in the same place enforcing values."

[88] The Reverend James Fuller wrote to the local school board and to Superintendent Thomas, advising them that they needed a "[b]etter understanding of which categories of ministers are appropriate participants. Categories represented in the first

59

The undeniable perception that this exclusive recruitment policy endorses religion is magnified by the undisputed record evidence that Clergy in Schools is the <u>only</u> volunteer program (1) designed exclusively by the School District (2) for which the School District actively recruits the individual participants. We are not reviewing a situation in which the government has simply accepted an offer of help from a pre-existing outside organization that coincidentally happens to be religiously affiliated. On the contrary, by creating its own ministerial organization, the School District has purposefully targeted the clergy, building Clergy in Schools around them from the ground up. As the summary judgment record confirms, the School District conceded that (1) it never created from scratch any of the other programs, (2) no other program is conducted by an organization that was not pre-existing, and, most importantly, (3) Clergy in Schools is the only volunteer program in the entire galaxy of such programs for which the School District both designated and applied the selection criterion for choosing volunteers rather than accepting self-selected volunteers. BISD had ample opportunity during the district court proceedings to adduce evidence to the contrary but never did so — for the best of all possible reasons: none exists.

---

> visit included:  pastors, associate pastors, lay ministers, [and] lay chaplains.  Some of these participants have educational training in ministry while some do not."  In a separate letter, Reverend Fuller specifically complained that another clergy participant in the program "does not have the temperament, experience, or credentials to participate in the kind of program which Dr. Thomas envisions. . . . [He] will be perceived as self-righteous and abrasive by students and I am not willing to risk such associations."

The recent Supreme Court case of <u>Mitchell v. Helms</u>[89] highlights this critical distinction between, on one hand, a program like Clergy in Schools that is "volunteer" in name only and for which each and every constitutive decision is attributable to the government and to the government alone; and, on the other hand, bona fide volunteer programs, such as the ones offered to the School District by the Junior League or the Kappa Alpha Psi Fraternity,[90] that are the result of "the genuinely independent and private choices of individuals."[91]  In <u>Mitchell</u>, a plurality of the Court emphasized that "if numerous private choices, rather than the single choice of a government," determine the beneficiaries of a government program "pursuant to <u>neutral eligibility criteria</u>, then a government cannot, or cannot easily, grant special favors that might lead to a religious establishment."[92]  It follows, then, that even if on remand the School District could point to other volunteer programs such as the Boy Scouts in

_____

[89] __ U.S. __, 120 S.Ct. 2530.

[90] The participation of these groups, in particular, in the School District's volunteer program underscores the importance of this distinction.  Membership in the Junior League is restricted to women; the membership of the fraternity is composed solely of African-American men.  The constitutionality of such explicitly discriminatory selection criteria, <u>if used by the government</u>, would have to survive heightened scrutiny and strict scrutiny, respectively, and it seems doubtful that either could hold up under such exacting analysis.  <u>See</u>, <u>e.g.</u>, <u>Wygant v. Jackson Bd. of Ed.</u>, 476 U.S. 267, 276 (1986) (concluding that school board's policy of extending preferential protection against layoffs to some employees on the basis of race could not be justified by the school board's interest in providing minority role models).

[91] <u>See</u> <u>Mitchell</u>, 120 S.Ct. at 2541.

[92] <u>See</u> <u>id.</u> (emphasis added).

61

which civic virtues and morality are addressed, the existence of any such programs, the staffing and goals of which are solely attributable to the private choices of individuals, still can do nothing to mitigate the religion-preferring choice that is the sole issue in this case and that is wholly attributable to government: BISD's conscious decision to restrict participation in the Program to the clergy and the clergy alone.

Frankly, I am mystified that anyone can read the entire record in this case, even, as we must, in the light most favorable to the non-moving School District, and somehow conclude that it is insufficient to support —— even compel —— a holding that (1) the School District's exclusive recruitment policy creates a perception of religious favoritism and (2) the School District has selected the clergy to staff the Program on the basis of religious credentials rather than on the basis of one or more neutral criteria.  If Clergy in Schools were emblematic of a general policy under which the School District itself actively recruited members of many professions and vocations, and thereafter assigned them to homogenous volunteer sub-groups segregated by profession, one might at least argue that the Program is neutral with respect to religion.  Such a policy would be more in keeping with the Supreme Court's recent admonition that neutrality, together with private choices, is necessary to eliminate any possible attribution to the government of a religion-preferring message.[93] The clergy certainly are not consigned to a disfavored status by the Establishment Clause, and they may participate freely in the public

---

[93] See Mitchell, 120 S.Ct. at 2530.

sphere.[94] But the record is totally devoid of evidence of any such plan or policy in the School District; were it otherwise, able counsel for the School District surely would have had the record so reflect.

Notwithstanding the Controlling Minority's protestations to the contrary, the record contains a surfeit of evidence confirming beyond cavil that the religious credentials of the clergy — and only these credentials — were what the School District looked to when it proceeded to implement its exclusive recruitment policy. Conversely, the record contains not a scintilla of evidence that BISD ever made any attempt to recruit volunteers across the board, then separate them according to vocation. The Controlling Minority implies that in limiting participation in the Program to clergy only, the School District was simply following a policy favoring the segregation of different professional groups into separate volunteer programs. The record is simply not susceptible of any such reading, and there is no justification for giving BISD another opportunity to make it read that way. The record shows that the only other program in the School District that is composed of a single vocational group,[95] the DARE (Drug

_____

[94] See, e.g., McDaniel v. Paty, 435 U.S. 618 (1978) (invalidating a provision of the Tennessee constitution disqualifying clergy from holding public office).

[95] In a letter written four days prior to trial and addressed to "all clergy," Superintendent Thomas asserted that "[i]n an effort to broaden volunteer opportunities for other professional groups and to tap other underutilized community resources, [BISD] has taken steps to actively recruit other volunteers including: (1) Federal Correctional Officers; (2) Lamar Student Government; [and] (3) National Association of Blacks in Criminal Justice." Superintendent Thomas's letter has no apparent purpose other than to serve as a trial exhibit; unlike other letters that he sent to the clergy, he did not even bother to sign it. Indeed, there is no

63

Abuse Resistance Education) program, is not a volunteer program at all. The DARE curriculum, including content, materials and testing, was adopted by the Texas Education Agency, and is taught by specially trained and certified law enforcement officers as part of their job responsibilities.[96] Furthermore, School Volunteer Program Coordinator Joy James testified that, even though all of the volunteers in each of the School District's "school-business partnerships" share the same _employer_, the volunteers have diverse vocations and different areas of substantive expertise.

Neither did the School District advance even one of its myriad "other" volunteer programs as paralleling Clergy in Schools' purpose of inculcating morals and civic virtue. This lacuna is no accident: Were there any such evidence "out there," the record would contain it. Simply put, there is no just reason to consign this case to the additional multi-year delay of a remand just to re-confirm this truism.

The undeniable inference of preferring religion that springs from the special treatment accorded to the clergy by BISD is strengthened by the circumstances in which the Clergy in Schools program was created.[97] The

_____

evidence in the record that the letter was ever distributed to the purported addressees. The credibility of the letter is further called into question by the fact that the three volunteer groups mentioned in it are not mentioned anywhere else in the record. Superintendent Thomas' letter certainly does not constitute the kind of "uncontradicted and unimpeached . . . evidence com[ing] from [a] disinterested witness" on which summary judgment can be based. See Reeves, 120 S.Ct. at 2110.

[96] See generally Bureau of Justice Assistance, An Introduction to Dare: Drug Abuse Resistance Education (2d. ed. 1991).

[97] "Our inquiry into this question not only can, but must, include an examination of the circumstances surrounding its

64

School District cannot acknowledge, on one hand, that one of its purposes in creating Clergy in Schools was to "[help ministers] know better how to attend to needs of young people in church," then claim, on the other hand, that its exclusive recruitment policy was instituted without regard to the clergy's religious credentials and functions. Similarly, the School District's dogged resistance to including secular professionals in the Program — even those professionals whom it has acknowledged under oath possess the same skills and qualifications as do the clergy — can only be explained by stating the obvious: The School District deemed the clergy's pastoral vocation to be the distinguishing characteristic that set them apart in a class of their own.

Indisputable in the record is the fact that the School District has lavished special attention on the clergy that has not been accorded to any other vocational or volunteer group. And we are not, as a matter of law, permitted to presume that other, secular groups will receive similar preferential treatment in the future: The Supreme Court flatly rejected such an approach in <u>Kiryas Joel</u>, noting that "we have no assurance that the next similarly situated group [will receive similar treatment]."[98] The School District's actions must stand or fall on the palpably sufficient summary judgment record in this case. Whatever else may be "uncertain" in that record, the Program's lack of neutrality toward religion is not; to the contrary, overt favoritism towards religion is amply established.

---

enactment." <u>Santa Fe Independent School District v. Doe</u>, __ U.S. __, 120 S.Ct. 2266, 2282 (2000).

[98] 512 U.S. at 703.

## II.

### *Non-secular Purpose*


The vigilance of the courts in maintaining religion-neutrality is at its most indispensable when questions regarding the establishment of religion arise in the arena of our public schools.[99] For that is where the political majority experiences the greatest temptation to use its public power to enforce the dictates of its own belief system, and that is where the audience is most impressionable, malleable, and vulnerable. School boards and administrators across the country must regularly make difficult decisions concerning how to instill morality and civic virtues in our children without inculcating religion in the process. In drawing the necessary dividing lines between civic virtues and a religious perspective on those virtues, it is critical that school boards and officials remain sensitive to the susceptibility of their charges to even the subtlest of influence and ensure that students are provided an educational environment in which religion is not put into play.[100]

Our public educators are both constrained and aided in their decisionmaking by the relatively clear and simple neutrality rules that are

---

[99] See Aquillard, 482 U.S. at 583-84 ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.").

[100] See Santa Fe, 120 S.Ct. at 2280 (striking down a government-created student election mechanism that "encourage[d] divisiveness along religious lines in a public school setting, a result at odds with the Establishment Clause.")

imposed by the Establishment Clause:  Leave religion out of the equation;[101]

do not use religious symbols as part of the educative process;[102] do not

conduct formal religious exercises on school property;[103] do not tailor a

curriculum to foster religious beliefs;[104] do not use a selection criterion

that favors religion in hiring, in choosing educational materials, or in

designating extracurricular activities.[105]

Regrettably, BISD transgressed these well-established boundaries when

it created the Clergy in Schools program.  The central idea of the Program

—— to educate students about morality and civic virtue —— is not just

permissible; it is commendable.  And the Does have not challenged that

---

[101] The government can, of course, make use of the secular aspects of religious texts, icons, and individuals.  For example, a school district could certainly use the Bible as one of several texts in a comparative religion class.  In so doing, however, the government must focus solely on the secular value of such materials:  Religion qua religion can never truly be permitted to become a factor in government decision-making.

[102] See Stone v. Graham, 449 U.S. 39 (1981) (Ten Commandments).

[103] See Abington, 374 U.S. 203 (Bible readings); Engel v. Vitale, 370 U.S. 421 (1962) (classroom prayer).

[104] See Aquillard, 482 U.S. 587 (creationism); Epperson v. Arkansas, 393 U.S. 97 (1968) (creationism); McCollum v. Board of Education, 333 U.S. 203 (1948) (sectarian classes on public school campuses).

[105] See, e.g., Widmar v. Vincent, 454 U.S. 263 (1981) (requiring equal access to school facilities for all extracurricular groups); Texas Monthly, 489 U.S. 1 (invalidating a tax exemption applicable only to religious publications); Kiryas Joel, 512 U.S. 687 (invalidating the New York State legislature's use of a religion-preferring criterion in establishing school districts); Santa Fe, 120 S.Ct. 2266 (striking down a government-created student election mechanism used to select student speakers at football games).

idea; neither have they challenged the School District's inclusion of clerics in the Program. Where the School District knowingly crossed the bright line that separates the permissible from the impermissible, however, was in deliberately choosing to limit participation in the Program exclusively to clergymen. The only purpose that the School District could possibly have had in consciously excluding members of all other vocations and professions from participating in the Program was to ensure that the students it would select to attend the sessions and be instructed would receive a perspective on morality grounded in religion.[106] That is not a religion-neutral purpose, and that is not permissible under the Establishment Clause.

If a government action is deemed to have been taken for the purpose of favoring, advancing, or endorsing religion, then no further analysis is required to conclude that an Establishment Clause violation has occurred.[107] This bedrock principle of Establishment Clause jurisprudence is best recognized today as the first prong of the so-called Lemon test, which

---

[106] It is no coincidence that one of the clerical participants in Clergy in Schools slipped at one point in a counseling session and quoted the Bible: To him, the Bible was the source of the moral truth that he was speaking. Quotations, of course, can be restrained by administrative policing, but perspectives surely cannot: It is unavoidably a religious view of morality that is offered to students by the Clergy in Schools program, at least as it is currently constructed. See Mitchell, 120 S.Ct. 2530, in which five Justices (O'Connor, Breyer, Souter, Ginsburg, and Stevens) reaffirmed the Court's longstanding presumption that religious instructors will inevitably interject religion into their lessons even when teaching purely secular topics. Rabbi Hyman, one of the participants in the program, expressed exactly this concern in his record testimony.

[107] Aquillard, 482 U.S. at 585.

68

assays the purpose of a government practice to determine whether that purpose is sectarian.[108] The challenged government practice in the instant case is the School District's decision exclusively to recruit clerics to staff the _only_ volunteer program that was designed by the School District to address civic virtues and morality and for which the School District actively seeks participants.

Purpose is assessed as of the time the government decision in question is made.[109] We look first to the explanation offered by the government in support of its decision.[110] If the proffered explanation is patently inadequate or if there is reason to believe that it is a sham, we turn to the events surrounding the making of the governmental decision as contextual evidence of the government's true purpose.[111] Contemporaneous

---

[108] See _Lemon_, 403 U.S. at 612. The _Lemon_ test has fallen into disfavor with several of the Justices currently sitting on the Supreme Court. See _Santa Fe_, 120 S.Ct. at 2284-85 (Rehnquist, C.J., dissenting) (setting forth a list of opinions in which the _Lemon_ test has been criticized). Nevertheless, the Supreme Court continues to apply the _Lemon_ test, see _Santa Fe_, 120 S.Ct. at 2281. I discuss the Program's failure of the _Lemon_ test in greater detail in Part III, _infra_.

[109] See generally _Aquillard_, 482 U.S at 585-96; _Wallace_, 472 U.S. at 56-61.

[110] _Aquillard_, 482 U.S. at 585-86.

[111] _Id_. at 586-87. Presumably subscribing to the maxim that an offense is the best defense, the Controlling Minority accuses _me_ of ignoring the relevancy of context in Establishment Clause analysis. On the contrary, context is the "clincher" in this case, as it is in almost every Establishment Clause case. See _Santa Fe_, 120 S.Ct. at 2282 ("Our inquiry into this question not only can, but must, include an examination of the circumstances surrounding its enactment.").

statements and incidents are highly relevant to this inquiry, even when, as here, the constitutional challenge is facial only.[112]

The School District has offered no plausible secular explanation in support of its decision exclusively to recruit clergy to staff the Program. As I have noted, the School District on several occasions was urged by concerned parents and participating clergy to integrate laymen and diverse professionals into the Program, and on each occasion the School District flatly refused. Superintendent Thomas, who first conceived of Clergy in Schools, and Joy James, who serves as coordinator of the School Volunteer Program, were asked in their courtroom testimony to justify the School District's initial and subsequent decisions to exclude all other vocations from the Program. Both conceded under questioning that mental health professionals, such as psychologists and social workers, have the same level of counseling and communication skills as do the clergy, and that they would provide equally good role models for the students. Nevertheless, these school administrators insisted that the clergy qua clergy possess some special quality justifying the School District's decision actively to recruit them to the exclusion of all other professions. James, after stating that she did not believe that "there would be any harm" in including secular professionals in the Program, explained that the School District did not do so because:

---

[112] See Aquillard, 482 U.S. at 595. See also Santa Fe, 120 S.Ct. at 2282 ("To properly examine this policy on its face, we must be deemed aware of the history and context of the community and forum.") (punctuation and citation omitted).

70

[T]hat's not necessarily part of the mission that we are hoping to accomplish with Clergy in Schools. . . . Because the Clergy in Schools follows a particular mission, which has been stated earlier today. . . . Let me just say that we're tapping the expertise of the clergy for this particular program, okay? . . . If we're doing something in the area of engineering, engineers, we're not going to ask an accountant to come in and work with them if they're talking about engineering business for that's the expertise the engineers can give us in that particular program.

When these remarks are viewed in pari materia with the School District's concession that mental health professionals have counseling skills equal to those of clergy members and that they are equally good role models, it becomes clear that James could only have been referring to a substantive expertise that the School District considers to be possessed by the clergy and no others. But, whereas engineers clearly do possess a unique substantive expertise in matters of engineering that accountants lack, clerics have no corner on the substantive expertise market in matters of virtue and morality (as distinct from theology) — at least none that the Establishment Clause permits the government to recognize

71

and act on.  The School District's "particular mission" in implementing the Clergy in Schools program –– to impart to students the particular brand of morality that it expected the clergy to convey[113] –– does not come close to articulating a permissible purpose under the Establishment Clause.

The events surrounding the creation of Clergy in Schools, which are well documented in the record, permit no inference other than that the School District's exclusive recruitment policy was religiously motivated from its very inception.  In distributing pamphlets to engender support for the Program, the School District was quite candid about its intent to aid the clergy in their religious as well as their secular endeavors.[114]  The informational materials proudly declare that the program will "provide more volunteer opportunities for clergy," "expos[ing] members of the clergy to the real world of today's students."  They further

---

[113] Although the Controlling Minority dismisses James's testimony, see Controlling Minority Opinion at 13, it studiously avoids offering any alternative explanation as to what "particular mission" the School District could possibly have had in mind for the clergy that would have been interfered with by adding other professionals to the program.

[114] BISD has not gone to any great lengths to conceal its religion-fostering purposes:  In her closing argument to the trial court, the School District's attorney declared that the Clergy in Schools program has "a two-fold mission, not just one, your honor, and it's clear from our mission statement that part of this program, a large part of this program, is to educate the clergy about what it is really like to be a student in BISD." Teaching clergy how better to minister to their flocks is not a constitutionally legitimate end for a public school district to be pursuing.

72

advance that "by ministers being exposed to problems of schools" they "will be aware of problems in schools and know better how to attend to needs of young people in church."[115]

The record evidence describing other contemporaneous incidents only serves to bolster the conclusion that the School District initiated its exclusive recruitment policy for the purpose of pursuing constitutionally impermissible ends. Shortly before implementing Clergy in Schools, Superintendent Thomas delivered a speech to a group of clergymen about the need to return prayer to the public schools. On a strictly personal level, he is entitled to this view, and there is no evidence in the record that as Superintendent he has ever overtly acted on this specific goal.[116] Nevertheless, the Superintendent's vocal support of school prayer

---

[115] This statement, the functional equivalent of which appears in at least two BISD documents, clearly represents what the School District considered to be a positive accomplishment of the Clergy in Schools program. The Controlling Minority's contention that the statement appears in the agenda of the School District's meeting as nothing more than an inducement for the clergy to join the program, see Controlling Minority Opinion at 13, is nothing short of ludicrous. By that reading of the document, "Morning Meetings – 10:00 a.m," which appears in the same column in the document, would also represent an inducement, which makes no sense at all. Moreover, with admirable candor, the School District has admitted throughout the course of this litigation that one of the primary goals of Clergy in Schools is to make the clergy more effective in performing their church-related duties.

[116] There is, however, evidence in the record that Superintendent Thomas frequently blurred the line between State and Church functions. For example, on at least one occasion he requested area clergy to deliver sermons on designated education-related topics.

girds the burgeoning impression that Clergy in Schools was intended by the School District to interject as much religion as it could get away with into the public school system.

So, too, does the School District's distribution of a leaflet entitled "Reasons for a School-Church Alliance" at its first Clergy in Schools organizational meeting. Neither the fact that the flyer was initially prepared by the president of the PTA nor the School District's post-litigation disavowal of the document can change the firmly established fact that, at the time of the organizational meeting, the School District found the views expressed in the flyer to be sufficiently coextensive with its own that it elected to distribute that brochure.[117] Rabbi Hyman, who attended that organizational meeting, testified that he came away with the distinct impression that the flyer "was obviously put in there to engender some support and provide some facts for this kind of program."

Not once has the Supreme Court upheld a government program that so blatantly endorses religious professionals as uniquely competent to pursue public ends, or one that so frankly declares

---

[117] In flagrant disregard of the uncontested record testimony of Superintendent Thomas and Rabbi Hyman — key witnesses for opposing sides in this litigation — the Controlling Minority baldly declares that the PTA President not only created the document, but also personally distributed it. See Controlling Minority Opinion at 4. Nothing in the record supports this contention. To the contrary, Superintendent Thomas testified quite plainly that the document "was distributed by us" at an organizational meeting of Clergy in Schools.

its intent to aid religious leaders in their sectarian endeavors. That a program, taken as a whole, may be directed toward a constitutional end has never before been permitted to shield essential features of such program from individual constitutional scrutiny.

In Wallace v. Jaffree, for example, the Supreme Court invalidated a government-mandated moment of silence that was set aside by the Alabama State legislature for "meditation or voluntary prayer."[118] Although five Justices expressed the view that moments of silence generally have a legitimate secular purpose,[119] the Court nevertheless struck down the particular moment of silence then under review because the Justices could discern no secular purpose for the addition of the words "or voluntary prayer" in the implementing statute. Similarly, in Edwards v. Aquillard, the Court invalidated the Louisiana Creationism Act for lack of a secular purpose even though the science curriculum of which it was a component part clearly pursued a legitimate secular end.[120] In like manner, when the Program is tested for a secular purpose, the governmental decision to recruit only clergy to conduct this morals

---

[118] 472 U.S. 38 (1985) (emphasis added).

[119] Justice Powell, 472 U.S. at 62; Justice O'Connor, 472 U.S. at 76-77; Justice Burger, 472 U.S. at 84-90; Justice White, 472 U.S. at 90-91; and then-Justice Rehnquist, 472 U.S. at 91-114.

[120] 482 U.S. 578 (1987).

and ethics program cannot stand.   It's just that simple.


## III.


*The Supreme Court's Establishment Clause Tests*


My discussion of the neutrality requirement in Part I of this opinion is independently sufficient to demonstrate that the School District's clergy-only recruitment policy is patently unconstitutional.  Nevertheless, to square my dissent against the accompanying opinions that deny the Program's unconstitutionality and to expose their flawed legal reasoning, I will also assess briefly the Program's constitutionality by running Clergy in Schools through the battery of tests designed by the Supreme Court to determine the compatibility of government action with the Establishment Clause.

The Supreme Court assesses compliance with the Establishment Clause through three separate tests: Coercion, Endorsement, and the so-called <u>Lemon</u> test.  As the Program's counseling sessions do not constitute formal religious exercises, the coercion test is inapplicable to the instant case.  And I have already demonstrated, in part I above, that the clergy-only recruitment and staffing policy of Clergy in Schools fails the Endorsement test by conveying the unconstitutional message that the School District favors

76

religion over nonreligion.[121]  All that remains is to confirm that Clergy in Schools cannot clear even one prong of the tripartite Lemon test.

A.    The Lemon Test's First Prong: Secular Purpose

We first look to see whether the government action in question had a secular purpose.[122]  If the action is determined to have been taken for the purpose of favoring, advancing, or endorsing religion, "no consideration of the second or third criteria of Lemon is necessary."[123]  I have already shown, in part II of this opinion, that the summary judgment record contains a surfeit of evidence that the Program's clergy-only recruitment and staffing policy was implemented by BISD for the unconstitutional purpose of endorsing a distinctly religious approach to the inculcation of morality and civic virtues.  When tested under Lemon's disjunctive secular purpose prong, therefore, the School District's decision to recruit only clergy to conduct the Program cannot stand.

B. The Lemon Test's Second Prong: Primary Effect

---

[121] See Allegheny, 492 U.S. at 592-93 (1989).

[122] See Santa Fe, 120 S.Ct. at 2281 ("Our Establishment Clause cases involving facial challenges . . . have not focused solely on the possible applications of the statute, but rather have considered whether the statute has an unconstitutional purpose.").

[123] Aquillard, 482 U.S. at 585 (punctuation omitted).

Both the Endorsement Test and the second prong of the Lemon test, which the Controlling Minority examines in tandem, inquire whether the challenged government program has the primary effect of advancing religion by conveying a message that religion is preferred over nonreligion. As such, the ultimate question under both tests is whether the challenged program is neutral toward religion.[124] I have already demonstrated, in part I of this opinion, the flagrant non-neutrality of BISD's policy of recruiting only clergy to staff the only volunteer program designed by the School District to inculcate morality and civic virtues. Accordingly, Clergy in Schools does not pass constitutional muster under either the Endorsement test or the second prong of Lemon. Nevertheless, as astonished as I am at the boldness of the Controlling Minority Opinion in "presum[ing] that the volunteers will comply with the program's secular guidelines" and refrain from any indoctrination of religion, I admire its subtle cleverness in leading the gullible down that primrose path.[125] Even though the Supreme Court has abandoned the presumption that public school teachers assigned to religious schools will inevitably indoctrinate

---

[124] Lemon, 403 U.S. at 612. As the instant case involves a facial challenge only, individual incidents that have occurred during the operation of the Clergy in Schools program are irrelevant to this inquiry.

[125] See Controlling Minority Opinion at 15.

their students in religion,[126] in <u>Mitchell v. Helms</u>,[127] five Justices (O'Connor, Breyer, Souter, Ginsburg, and Stevens) reaffirmed the Court's longstanding converse presumption —— precisely opposite the presumption slipped in by the Controlling Minority —— that religious instructors will inevitably interject religion into their lessons even when teaching purely secular topics.[128]  It is inconceivable that the <u>Ball</u> presumption would not be applied "in spades" to full-fledged <u>religious ministers</u> teaching classes in <u>public</u> schools on such a religion-related topic as morality.  Other than calling the Controlling Minority's hand on this bit of legerdemain, however, I refrain from expressing any opinion on this issue because we need not reach it to conclude that, as currently constructed, Clergy in Schools is unconstitutional.

C. Third Prong of the <u>Lemon</u> Test:  Entanglement

In the wake of the Supreme Court's decision in <u>Agostini v. Felton</u>,[129] <u>Lemon</u>'s third prong has evolved as the least defined of the Establishment Clause tests.  It is now clear that "[e]ntanglement must be ‹excessive' before it runs afoul of the

_____

[126] <u>See</u> <u>Agostini v. Feldman</u>, 521 U.S. 203, 223-28 (1997).

[127] __ U.S. __, 120 S.Ct. 2530 (2000).

[128] <u>See</u>, <u>e.g.</u>, <u>School District of Grand Rapids v. Ball</u>, 473 U.S. 373, 399-400 (1985) (O'Connor, J., concurring in the judgment in part and dissenting in part), overruled in part by <u>Agostini</u>, 521 U.S. at 236.

[129] 521 U.S. 203 (1997).

Establishment Clause."[130]    Equally clear is the truism that, in determining whether the entanglement effect of a particular government action is excessive, "the resulting relationship between the government and [the] religious authority" is a critical factor.[131]  But to date the Supreme Court has offered scant guidance as to what quality and quantity of entanglement is excessive, leaving the inferior courts to puzzle through this analysis on our own.

Because this particular facet of the law, dealing as it does with Establishment Clause analysis, is so ill-defined, and because both the first and second prongs of the disjunctive <u>Lemon</u> test provide sufficient independent bases on which to declare the School District's exclusive recruitment policy —— and, therefore, Clergy in Schools —— facially unconstitutional, I refrain from analyzing the entanglement aspect of the Program in great detail.  I cannot help but note in passing, however, that when the government invites clergymen qua clergymen to come into its public schools and refuses to invite any others, thereby publicly according the clergy "most favored nation" status; when the government conducts organizational meetings with clergy participants at local churches; when the government encourages the clergy who attend those meetings to pray before going into the schools; when the government creates <u>ab</u>

---

[130] <u>Id.</u> at 233.

[131] <u>Id.</u> at 232.

80

initio a clergy-only volunteer group and asks that group to conduct a morals and ethics program in the public schools; when the government openly declares that a central purpose of that program is to help the clergy better minister to their congregations; and when school administrators greet the clergymen and shepherd them into classrooms, select the students to be counseled, and remain in the sessions to steer, guide, and control the proceedings, I find it impossible — at least without donning blinders — to conclude that the resulting entanglement between Church and State is anything short of "excessive." Were it necessary to do so, I would hold that Clergy in Schools in its entirety, with the School District's clergy-only recruiting policy at its core, fails the third prong of the Lemon test as well, leaving the Program without a single constitutional foothold from which to claim conformity with the dictates of the Establishment Clause and its central theme of neutrality toward religion.

IV.

*Standing*

Although I concur in holding that the Does have standing to press their claims before this court, the Controlling Minority's anvil-like subtlety in warning that "standing must be demonstrated at all stages, including trial"[132] compels me to offer a few words of my own on the subject. Even though it blurs the concepts of

---

[132] See Controlling Minority Opinion at 3.

81

Equal Protection and the Establishment Clause, I do not choose to take issue with the pronouncement of the Controlling Minority that the exclusion of the Does from the benefits of a school-financed program in which they cannot in good conscience participate suffices as a cognizable injury for purposes of standing. I do, however, view the ever-present threat of forced or coerced inclusion in such a program as an even stronger ground for finding standing, especially now that remand will inevitably prolong the exposure of the Does and others similarly situated to a religion-preferring activity. I must respectfully take issue, therefore, with what I view as Judge Jolly's misreading of the Supreme Court's decision in Valley Forge.[133]

A fair reading of Valley Forge makes clear that the threat of being selected by the School District to attend a Clergy in Schools session is sufficient to confer standing on the Does to seek "pre-exposure" relief from the federal courts.[134] That they have not yet suffered any direct psychological harm is irrelevant; after all, the plaintiff in Lee v. Weisman was allowed to challenge a school district's use of graduation prayers four years prior to her

---

[133] Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464 (1982).

[134] Id. at 472 ("Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.") (punctuation and citation omitted) (emphasis added).

scheduled graduation.[135]  As the Supreme Court stated just months ago in Santa Fe, "the simple enactment of this policy, with the purpose and perception of school endorsement of [religion], was a constitutional violation.  We need not wait for the inevitable to confirm and magnify the constitutional injury."[136]  Neither is it material that the school children, including the Doe children, are permitted by the School District to "opt out" of the Program.  "Opt out" clauses have long been considered by the Supreme Court to be constitutionally irrelevant.[137]  Finally, the fact that it may be statistically unlikely that any of the individual plaintiffs will be selected to participate in the School District's ongoing Program is of no moment:  If it were, the government would always be able to defeat pre-enforcement challenges merely by randomizing the occurrence of unconstitutional events that it wished to sponsor.[138]

Once again, context is all-important.  As plaintiffs, the Does have presented ample record evidence to show that every single day that their children attend school they are subjected to the threat

---

[135] 505 U.S. 577, 584 (1992).

[136] 120 S.Ct. at 2282.

[137] See Abington, 374 U.S. at 225 ("Nor are these required exercises mitigated by the fact that individual students may absent themselves upon parental request[.]").

[138] Imagine, if you will, a teacher drawing a number out of a hat at the start of each class day, and then engaging in a Bible reading if he happens to draw the number 1,000.  See Santa Fe, 120 S.Ct. at 2282-83 ("Government efforts to endorse religion cannot evade constitutional reproach based solely on the remote possibility that those attempts may fail.").

83

of a constitutional injury.  The Does are in no way comparable to the Valley Forge plaintiffs, who had only the most abstract and geographically remote of interests in bringing their challenge. The Does do not merely disagree in a general, intellectual sense with the School District's actions; rather, they object to their children's being forced personally to run the risk every day of being subjected to a religion-endorsing program that operates in their very own schools.[139]  This ever-present, tangible risk, faced in the very school buildings that they are compelled by law to attend, is more than sufficient to vest the Does with Article III standing, as injured parties, to bring their complaint.[140]

IV.

*Conclusion*

---

[139] I respectfully suggest that Judge Jolly is simply wrong when he argues that plaintiffs in Establishment Clause cases are required to go further than this by showing that, because of their fear of being subjected to the unconstitutional program, they are presently suffering from deleterious psychological harms.  As noted above, the plaintiff in Lee v. Weisman was allowed to challenge a school district's use of graduation prayers four years prior to her scheduled high school graduation.  505 U.S. 577, 584 (1992).

[140] The concurrence by judges constituting a majority of this en banc court that the Does have alleged sufficient actual or threatened injury to confer standing makes it unnecessary to reach the Doe's alternative claim of taxpayer standing.  Because on remand the Does must once again demonstrate standing at trial, however, I note that they are likely to have standing as taxpayers to challenge the Program.  To demonstrate standing on that basis, the Does need show only that (1) they pay taxes to the relevant government entity — here, the School District, and (2) tax revenues are expended on the disputed practice — here, the Clergy in Schools program.  See Doe v. Duncanville Independent School District, 70 F.3d 402, 408 (5th Cir. 1995) (citations omitted).

The existing record establishes beyond cavil that the School District's clergy-only recruitment policy is clearly unconstitutional:  It endorses religion by holding the clergy up to the students, parents, and citizens of Beaumont as exclusively superior teachers and inculcators of moral attitudes, beliefs, and practices.  The clergy may, of course, consistent with the Establishment Clause, freely participate in the public sphere; but the Establishment Clause does not permit the government to accord them such favored status.

The Controlling Minority's insistence on analyzing the School Volunteer Program as a whole deliberately loses sight of the trees for the forest by side-stepping the one issue that we have been called on to address:  <u>The constitutionality of the School District's clergy-only recruitment and staffing policy</u>.  On the strength of the extant record, that policy, when forthrightly tested for neutrality pursuant to <u>Allegheny</u> and properly viewed through the lens of the Supreme Court's Establishment Clause tests, is indisputably unconstitutional.  The fact that a case requires us to draw close and difficult lines in an area as sensitive as the Establishment Clause does not relieve us of our duty to decide it. It is for these reasons that I respectfully but strenuously dissent from this court's failure to grant summary judgment to the Does, and from its remand of this case to the district court to perform what I perceive to be a stereotypical hollow act.

85